JAMES SARGENT, Appellant, *v.* THE BOARD OF EDUCATION OF THE CITY OF ROCHESTER et al., Respondents.

1. ORPHAN ASYLUMS — PAYMENT OF PUBLIC MONEYS FOR SECULAR EDUCATION OF INMATES. St. Mary's Boys' Orphan Asylum of the city of Rochester, incorporated under chapter 319 of the Laws of 1848, is neither a school nor an institution of learning within the meaning of section 4 of article 9 of the Constitution prohibiting the payment of public moneys to a denominational school or institution of learning, but on the contrary is an orphan asylum within the meaning of section 14 of article 8 of the Constitution permitting the payment of public moneys for the secular education of the inmates therein.

2. BOARD OF EDUCATION OF CITY OF ROCHESTER EXPRESSLY AUTHORIZED TO EMPLOY AND PAY TEACHERS. Under the charter of the city of Rochester (L. 1880, ch. 14, § 131, amd. L. 1898, ch. 660, § 127) and under the Consolidated School Law (L. 1894, ch. 556, tit. 15, art. 12, § 32) the board of education is not only expressly authorized to employ and pay teachers for the secular education of the inmates of such asylum but their employment for that purpose is imposed upon it as a duty.

3. SECTARIAN CONTROL IMMATERIAL. The fact that such asylum is controlled by a religious organization and that the teachers employed by the board of education, who were duly licensed to teach by the public authorities, were members of a sisterhood connected with such denomination, is immaterial, since the statute clearly recognizes the fact that the instruction of the inmates is neither practicable nor possible elsewhere than in the institution itself, and it is the duty of the board to provide for their secular education therein, regardless of the religious belief of those in control of the asylum.

4. STATUTES AUTHORIZING EMPLOYMENT NOT MANDATORY. The several statutes under which the moneys are raised and paid over to the board of education for the purpose of defraying the expense of secular education in orphan asylums are not mandatory and, therefore, violative of the Constitution; but if they were they could properly be disregarded by the local authorities.

*Sargent* v. *Board of Education,* 76 App. Div. 588, affirmed.

(Argued January 13, 1904; decided January 29, 1904.)

APPEAL from a judgment of the Appellate Division of the Supreme · Court in the fourth judicial department, entered December 23, 1902, affirming a judgment in favor of defendants entered upon a dismissal of the complaint by the court on trial at an Equity Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*David N. Salisbury* for appellant. The conclusions of law of the trial court, that the board of education of the city of Rochester had power to employ sisters of charity to teach in St. Mary's Boys' Orphan Asylum and to pay them for such services were erroneous. (*People ex rel.* v. *Bd. of Education,* 13 Barb. 400; Cooley on Const. Lim. [5th ed.] 580; *People ex rel.* v. *Fitch,* 154 N. Y. 14; *Matter of N. Y. & B. Bridge,* 72 N. Y. 529; *McCarty* v. *Orphan Asylum,* 9 Cow. 506; *People ex rel.* v. *Porter,* 47 N. Y. 379; *Hoey* v. *Gilroy,* 129 N. Y. 137, 138; *People ex rel.* v. *McClave,* 99 N. Y. 89; *Richards* v. *Black,* 6 C. B. 441; Broom's Leg. Max. 430.)

*William A. Sutherland,* for Board of Education of the City of Rochester et al., respondents. No constitutional provision applies to this controversy. (*People ex rel.* v. *School Board,* 161 N. Y. 598; *People ex rel.* v. *Gallagher,* 93 N. Y. 437.)

*James M. E. O'Grady,* for St. Mary's Boys' Orphan Asylum et al., respondents. The defendant, St. Mary's Boys'

Orphan Asylum, is not an institution of learning as described in section 4 of article 9 of the New York State Constitution, but is an orphan asylum as defined by section 14 ·of article 8 thereof. (*St. P. O. Asylum* v. *Bd. of Education*, 34 How. Pr. 227; *People ex rel.* v. *Comptroller*, 152 N. Y. 399; *People ex rel.* v. *Fitch*, 154 N. Y. 14; *People ex rel.* v. *N. Y. Society*, 161 N. Y. 233; 162 N. Y. 429.) It being the duty of the city to provide for the secular education of the inmates of St. Mary's Boys' Orphan Asylum, it adopted the proper course, and this plaintiff appellant is in no position to question the manner of furnishing the secular education. (L. 1884, ch. 556, tit. 15, art. 12.)

O'BRIEN, J.    This is a taxpayer's action to restrain the payment of certain public moneys raised for the purposes of education but which, it is claimed, cannot be properly devoted to the specific purpose for which the funds were raised. In other words, it is alleged that the public officers who have been made defendants in the action are about to deal with this fund in violation of law, and an injunction is demanded to restrain waste and misapplication of the money. The board of education of the city of Rochester was made a defendant, and so were the financial officers of the city, who are required by law to audit and pay claims upon the treasury certified by the board of education. St. Mary's Asylum for Orphan Boys and four sisters who are employed therein by the board of education to teach the inmates were also made defendants. The only relief demanded is that the board of education be enjoined from auditing or paying the salaries of these four sisters employed by them to teach the inmates of the asylum. The board of education and the orphan asylum are both corporations duly organized under the laws of this state. The purpose for which the asylum was incorporated is declared to be the " maintenance and tuition of orphan children of the male sex, and in particular of male orphan children of soldiers who have lost their lives in the service of the United States." It appears and is found that this corporation is controlled by

persons who are members of the Roman Catholic church and
by persons who are officers of such church and have such con-
trol by reason of being members and officers of the same.
The courts below, after a trial and hearing, upon appeal dis-
missed the complaint, and the only question involved in the
controversy is whether the board of education had the legal
right to employ and pay the sisters of charity who gave the
secular instruction to the inmates of the asylum.

It is found that for many years past the city, through the
board of education, has contributed money to the asylum for
the purpose of the secular education of the orphans under its
charge; that the institution gave secular education the same
as that furnished the children of like age in the public schools
and the same system of grades, the same course of studies, the
same text books, examinations and hours of study were fol-
lowed therein and made use of in the teaching of the inmates;
that no denominational tenet or doctrine is taught or relig-
ious instruction imparted in the asylum during the hours of
school prescribed by the rules and regulations of the board of
education, but religious instruction is given in the evening at
seven o'clock.  The four· teachers whose salaries it is sought
to.cut off by the action have been employed by the board by
being appointed and paid as such teachers, one for thirteen
years, one eleven years, one eight years and one three years;
that all of these teachers are educated and experienced teach-
ers and were so employed at the date of the passage of the act
of 1898, known as the Dow·law; that the asylum is subject
to visitation by the state board of charities, and that the
inmates are received and retained pursuant to the rules estab-
lished by the said board; that the salaries of these four teach-
ers have been and are paid out of the funds raised by direct
taxation upon the property assessed in the city, and have not
been and are not paid out of the common school fund of the
state; that the asylum maintains no institution of learning or
school, within the meaning of the State Constitution, but it
has maintained an orphan asylum within the meaning of sec-
tion fourteen of article eight thereof; that the sums paid to

these four teachers monthly during the ten school months of each year amount in the aggregate to one hundred and ninety dollars per month, and these amounts were paid to each personally by check to the order of each respectively for services rendered as a teacher in furnishing secular education to the inmates of the asylum; that the asylum, as such, furnishes, in addition to secular education, board, clothing, correction and moral training to its orphan inmates, and has as inmates children who, by reason of age, receive no secular education whatever; that the common council of the city, in the annual tax levy for the year 1901, raised by general taxation the sum of $610,850 for the use of the board of education, to be expended by said board for the secular education of the school children of the city and the inmates of the various orphan asylums of the city, including the inmates of the asylum in question, of which amount $323,850 was appropriated for the salaries of teachers, which is the amount certified by the board as necessary for such salaries, and in computing such amount the salaries for the four defendant teachers were included; that the common council in the year 1901 appropriated and raised by tax, for furnishing secular education, a sum equal to twenty-five dollars per capita upon a total of 24,434 pupils, based upon the total number of persons receiving secular education in the schools and asylums of the city during that year, and that the inmates of the asylum in question were included in the number upon which the per capita tax was raised. The affirmance of the judgment by the court below was unanimous, and the only question is whether, upon these undisputed facts, the payment by the board of the salaries, as teachers, of these four sisters of charity was in any sense illegal.

It is strenuously urged by the learned counsel for the plaintiff that such payment is in violation of the provisions of the Constitution of this state and unauthorized by law. Of course, if this proposition can be maintained, the plaintiff ought to have succeeded in the action. The basis for this contention is section four of article nine of the Constitution,

which reads as follows : " Neither the State nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." It will be observed that the orphan asylum in question is neither a school nor institution of learning, and hence it would seem to be plain that the prohibition contained in the section has no application.    But there is another section of the Constitution which must be read with the one just quoted, and that is section fourteen of article eight, which reads as follows : " Nothing in this Constitution contained shall prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper ; or prevent any county, city, town or village from providing for the care, support, maintenance and secular education of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under public or private control.    Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the Legislature.    No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the State Board of Charities." In this case the money was raised for the secular education of the inmates of the orphan asylum, and we are told in the plainest terms that nothing contained in the Constitution shall be construed to prevent such action.    In so far as the claim is made that the action of the board of education in disbursing money for the secular education of the inmates of the asylum, including the payment of teachers therein, is illegal, obviously the contention has no foundation whatever.

By chapter 261 of the Laws of 1850 it was provided that

the several incorporated orphan asylums in the state, other than those in the city of New York, should participate in the distribution of the school moneys in the same manner and to the same extent in proportion to the number of children educated therein as the common schools in their respective cities or districts. Since the enactment of that statute it seems that the city authorities have uniformly raised money for the purpose specified therein without objection from any source. Indeed, it was held by the Supreme Court that these asylums could compel the board of education to disburse the money for the purposes specified in the statute. (*St. Patrick's Orphan Asylum* v. *Board of Education,* 34 How. Pr. 227.) The statutory and common law existing in this state prior to the adoption of the present Constitution has been preserved intact, except so far as it is in conflict with the fundamental law and it has been held by this court since the adoption of the present Constitution that the system of statutory law for the maintenance of charities administered by private corporations did not fall when the Constitution went into effect. (*People ex rel. Inebriates' Home* v. *Comptroller,* 152 N. Y. 399.) Of course, this proposition applies with full force to statutes for the expenditure of money raised by taxation to impart secular education to the inmates of orphan asylums.

But it is earnestly contended in behalf of the plaintiff that there was no statutory authority for the board of education to employ and pay the four teachers in question. It is undisputed that the common council of the city had the power to raise money by taxation at the rate of not to exceed twenty-five dollars per capita for the education of all children in the city of school age, including those that are detained in the orphan asylums. It is undisputed that it had power to raise all moneys for the payment of teachers that was certified to be necessary by the board of education and the board certified to the common council the number of children of school age, including those in the asylums and the amount of money necessary to pay teachers, including the four teachers in

question, and the common council did raise the money and paid it over to the board of education. Now, what was the board of education to do with this money? Obviously, it was its duty to apply it to the purpose for which it was raised, and it was raised in part for the secular education of inmates of orphan asylums and the payment of teachers therein. It had no power or right to divert the money to other purposes or to refuse to expend it. The board had certified to the common council that the money was necessary for the purpose specified, and since the city authorities did actually raise the money and put it under the control of the board of education, these facts alone would seem to constitute sufficient authority to the board to do all that the plaintiff complained of. But we are not left to rest the case upon any implied authority, clear and satisfactory as that would seem to be. There was express statutory authority given to the board to employ these four teachers and to take such other means as were necessary to impart secular education to the inmates of this orphan asylum. By the charter of the city (Laws of 1880, chap. 14, § 131) the board of education is given the power, and it is made its duty, " to establish and organize in the several wards of the said city such and so many schools (including the common schools now exising therein) as they shall deem requisite and expedient, and to alter and discontinue the same; to contract with, license and employ all teachers in said schools, and at their pleasure remove them." It will be seen that this language does not limit the power of the board to the maintenance of what are called the common schools. They were to be included in the scheme of education, but the board was authorized to establish and organize as many schools within the city as they should deem requisite and expedient, and to alter and discontinue the same. This was a large discretionary power, and doubtless conferred sufficient authority upon the board to extend the benefits of education to the inmates of the asylum. It is quite too narrow a construction to say that their power was limited entirely to what are known as the common schools. But by chapter 660 of the Laws of

1898, section 127, the powers of the board were very much enlarged. It was authorized by that statute " to establish kindergartens, common schools, one or more high schools, manual training schools or classes, evening classes or schools for special studies, training schools or classes for teachers, and truant schools, and shall have power to discontinue or consolidate schools." It is quite clear from the language of this later statute that the legislature intended to confer upon the board very large powers and great discretion with reference to the organization and maintenance of schools, and clearly the power thus conferred was not limited to what are commonly known as the common schools. By the Consolidated School Law (L. 1894, ch. 556, tit. XV, art. XII, section 32) provision is made for the organization and maintenance of a great variety of special schools, such as industrial training schools, schools for music, for colored children, for Indian schools and for orphan schools. With respect to the latter class of schools the statute, tit. XV, art. XII, section 32, reads as follows: " The schools of the several incorporated orphan asylum societies in this state, other than those in the city of New York, shall participate in the distribution of the school moneys, in the same manner and to the same extent, in proportion to the number of children educated therein, as the common schools in their respective cities or districts. The schools of said societies shall be subject to the rules and regulations of the common schools in such cities or districts, but shall remain under the immediate management and direction of the said societies as heretofore." In view of these clear statutory provisions it is quite plain that the board of education not only had ample power to do everthing that is complained of in this case, but the employment of these teachers for the education of the inmates of asylums was imposed upon the board as a duty.

But it is contended in behalf of the plaintiff that public moneys ought not to have been used for the education of children in an orphan asylum maintained by any church or religious organization. The plaintiff is evidently willing that

the children should be educated but in some other place than ,
the asylum. It is said that children ought to be removed
from the influence of religious teaching in the asylum and
especially the influence of female teachers who belong to some
religious order and wear the garb of that order. It is quite
clear, I think, that such objections do not rest upon any
reasonable foundation. In the first place, it is perfectly obvious
that these children could not receive instruction in any other
place. They were under the exclusive control of the mana-
gers of the asylum. They were in a certain sense deprived
of their liberty. Some of them may have been sent to the
asylum after conviction for crime, and in such cases they may,
when of a certain age, be committed to such an institution by
magistrates, courts and judges. (*Corbett* v. *St. Vincent's Indus-
trial School*, 177 N. Y. 16.) The children that were placed in
the asylum otherwise, that is, by parents and guardians, were
under the same discipline and control, and it is plain that they
could not be discharged from such control or the discipline of
the institution. In some sense it would be about the same as
discharging boys from the county jail in order to permit them
to attend the common schools. Of course, such an idea is
entirely inadmissible, but it is plain that the statute last above
quoted contemplated that the teaching of these orphan boys
should be in the asylum where they were detained. The
language is that the asylum "shall participate in the
distribution of the school moneys in the same manner
and to the same extent in proportion to *the number of
children educated therein* as the common schools in
their respective cities or districts." The statute clearly
recognizes the fact that the instruction was to be had
or given *therein*, that is, in the asylum where the boys
were detained. When we look into the debates on this
subject in the Constitutional convention when the pro-
visions of the Constitution already quoted were the subject of
debate it is clearly apparent that the members of that body
understood that instruction in the case of orphan children
detained in an asylum was neither practicable nor possible

elsewhere than in the institution itself. The four teachers in question were licensed by the public authorities to teach. To license them as qualified teachers and employ them and receive the benefit of their services and then refuse to pay them upon the objection of some taxpayer would be a species of injustice unworthy of a great state.

The objection is made that the several statutes referred to and under which the moneys were raised and paid over to the board of education for the purpose of defraying the expense of secular education in orphan asylums are mandatory and thus in violation of the Constitution. When the statutes are all read together it will be seen that they are not an arbitrary mandate of the legislature but the depository of large discretionary powers, and even if they were, the only consequence would be that they could be disregarded by the local authorities. The statutes are good as an authority even though they would be held to be void as a command. They are certainly broad and comprehensive enough to confer authority upon the city government and the board of education to raise and expend the money for the purposes indicated, and to do all the things of which the plaintiff complains in this case. There was no error in the disposition of the case below, and therefore, the judgment must be affirmed, with costs.

PARKER, Ch. J., GRAY, BARTLETT, HAIGHT, MARTIN and CULLEN, JJ., concur.

Judgment affirmed.