---

(92 App. Div. 270.)

### MT. SINAI HOSPITAL v. HYMAN.

(Supreme Court, Appellate Division, First Department. March 11, 1904.)

1. CONVEYANCE—CONSIDERATION.

A conveyance by a city of a tract of land originally a part of the common lands of the city to a hospital incorporated under Laws 1848, p. 447, c. 319, and the acts amendatory thereof, is not supported by a valuable consideration by the fact that the land will be subject to taxation in the hands of a purchaser from the corporation.

2. FINDINGS OF FACT—WHEN DEEMED CONCLUSIONS OF LAW.

Where the evidence is undisputed, a finding of a referee, expressed as a finding of fact, is, in effect, a conclusion of law.

3. HOSPITALS—GRANTS TO—VALIDITY.

A grant by a city, pursuant to Laws 1898, p. 770, c. 257, and Laws 1900, p. 372, c. 166, conveying a tract of land to a corporation incorporated under Laws 1848, p. 447, c. 319, and the acts amendatory thereof, and organized, as stated in its certificate of incorporation, to maintain a hospital for a particular nationality and creed, in consideration of the corporation pledging itself to apply the proceeds to the objects of the corporation as set forth in its certificate, is void, as contrary to Const. art. 8, § 10, prohibiting a city from giving any corporation any property except for the support of the poor, though the constitution of the corporation declared the object of the corporation to be the management of a hospital for nursing sick persons of any creed or nationality.

4. SAME.

Const. art. 8, § 11, which provides for a state board of charities, and which declares that existing laws relating to charitable institutions shall remain in force; and section 14, which provides that nothing shall prevent the Legislature from making provisions for the education and support of the blind, dumb, etc., or prevent any city from providing for the care, etc., of inmates of orphan asylums, etc., under private or public control, but no payments by cities to charitable institutions shall be made for any inmate thereof who is not received and retained therein pursuant to rules established by the state board of charities—prohibits a city from

granting land to a corporation organized under Laws 1848, p. 447, c. 319, and the acts amendatory thereof, for the purpose of maintaining a hospital for a particular nationality and creed, subject only to the pledge of the corporation to use the proceeds thereof for its chartered purposes, the Constitution contemplating that the rate of payment by cities shall be on a per capita basis.

Appeal from Judgment on Report of Referee.

Action by the Mt. Sinai Hospital against David Hyman. From a judgment for plaintiff, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Abel E. Blackmar, for appellant.

F. R. Minrath, for respondent.

HATCH, J. The Mt. Sinai Hospital, a domestic corporation, brings this action for the purpose of compelling the defendant to specifically perform a contract executed by him for the purchase from the corporation of certain real estate, claimed to be the property of the corporation, and located on the east side of Lexington avenue, between Sixty-Sixth and Sixty-Seventh streets, in the borough of Manhattan, city of New York. The plaintiff was incorporated in 1852 under the name of the "Jews' Hospital in New York," pursuant to the provisions of "An act for the incorporation of benevolent, charitable, scientific and missionary societies," passed April 12, 1848 (Laws 1848, p. 447, c. 319), and of the acts amendatory thereof. The purpose of its incorporation, as stated in its certificate, was the giving of medical and surgical aid to persons of the Jewish persuasion, and for all other purposes appertaining to hospitals and dispensaries. Pursuant to the provisions of chapter 627, p. 1344, of the Laws of 1866, its name was changed to the "Mt. Sinai Hospital." No other change in its certificate was made by the provision of that act or of any other. After the change in name, however, the provisions of its constitution were enlarged, and the declared subjects of the corporation were stated to be "the establishment, support and management of an institution to be known as the Mt. Sinai Hospital for the purpose of affording medical and surgical aid and nursing sick and disabled persons of any creed or nationality." In 1871 it built a hospital building on what is known as "Plot 1," and in 1894 it erected a building for a dispensary on what is known as "Plot 2." In brief, the history of the titles which the corporation has acquired to these two plots of ground is as follows: Such lands were originally a part of the common lands of the city of New York. The source of title in both plots of land is the same, but they passed to the corporation by a different chain of conveyances. Plot 1 was leased by the city to the corporation under an indenture of lease dated May 31, 1871, for a period of 99 years at a rental of $1 per year. The authority for this lease is found in section 5 of chapter 853, p. 2021, of the Laws of 1868, which was an act to make provision for the government of the city of New York. By this act the commissioners of the sinking fund were authorized to execute a lease to the corporation upon such terms and conditions as had theretofore been made by the municipal authorities to charitable institutions. The provisions of this lease required that

the premises should be used for a hospital and for the charitable and benevolent purposes for which the plaintiff was incorporated, and that the buildings erected thereon should be used for such purposes, and should at all times be open for public purposes, and to patients of all creeds and denominations. The lease was conditioned to be void if such buildings were not erected and maintained, or if the plaintiff should cease to use it for a hospital, or to keep the same open for patients of all creeds and denominations, or should use it for any other purpose. By the provisions of chapter 257, p. 770, of the Laws of 1898, the commissioners of the sinking fund were authorized to grant to the corporation title to the land in fee-simple absolute, and to authorize it to sell and convey or lease the same, and devote the proceeds of such sale, or the income, to the maintenance and support of the hospital. The act provided:

"But nothing herein contained shall be construed to compel a vendee or lessee to see to the proper application of the purchase price or rent, nor shall any misapplication thereof affect the validity of any deed or leases made by the Mt. Sinai Hospital."

After the passage of this act the corporation petitioned the commissioners of the sinking fund for a grant pursuant to its provisions, setting forth therein the lease, the insufficient space and accommodations for the hospital, and expressing the intention to build larger buildings and provide much better accommodations, for which purpose they had purchased a plot of ground on the east side of Fifth avenue, embracing the block between 100th and 101st streets, with a depth therein of 325 feet, and also setting forth that it desired to sell the lands which it then occupied under the lease, and devote the proceeds thereof to the erection of buildings on the property which it had purchased. This petition contained the clause:

"Your petitioner pledges itself to apply the proceeds of such sale to the purposes and objects of its incorporation, as set forth in its certificate of incorporation, as modified by the laws affecting the same."

On June 9, 1898, the commissioners of the sinking fund acted upon the petition, and passed a resolution that a grant of the premises held under the lease be made to the corporation in fee-simple absolute; provided, however:

"That the proceeds of said sale, or the income from such leases as may be made by it, shall be applied to the maintenance and support of said Mt. Sinai Hospital, but no purchaser or lessee of the whole or any part of said property, or his or their heirs, executors, administrators, and assigns, shall be compelled to see to the proper application of said proceeds or rentals, nor shall any misapplication thereof affect the validity of any deeds or leases made by the Mt. Sinai Hospital; and further provided, that such lots and the improvements thereon shall not be exempt from taxation."

On or about November 28, 1898, a deed of the premises was made and executed by the mayor and city clerk, which deed recited the resolution of the commissioners of the sinking fund, and conveyed the property to the corporation in fee-simple absolute. The title to plot 2 was acquired by the corporation by a substantially similar process. The first lease was made pursuant to chapter 189, p. 289, of the Laws of

1881, which authorized a leasing for a period of 99 years at a nominal rent. This was a special act. After authorizing the lease, the act recites:

"Having in view the provision made by such institution for a class of patients needing hospital treatment, and who would otherwise become a public charge upon the mayor, aldermen, and commonalty of the city of New York."

Section 2 of the act provided:

"Such lease shall contain a covenant on the part of said corporation   *   *   * that no charge whatever shall be made for the treatment in any of the wards of the building to be erected upon the said land."

A lease was authorized by the commissioners of the sinking fund April 27, 1888, for a period of 21 years at a rental of $630 per year, with covenants for three renewals at an appraised rental. A lease pursuant thereto was executed on May 1st following, containing the covenant for renewals, and also "that the lessee shall erect a hospital building and treat all patients free therein." This lease covered a part of plot 2. Chapter 45, p. 70, of the Laws of 1892, authorized the leasing of the remainder of this plot. The act provided:

"Such lease to be of a period of 99 years, at such nominal rent as they may deem advisable, having in view the provision made by such institution for a class of patients needing hospital treatment, who would otherwise become a public charge upon the mayor, aldermen, and commonalty of the said city."

By chapter 553, p. 1085, of the Laws of 1892, the commissioners of the sinking fund were authorized to modify in such manner as they might deem proper the lease executed pursuant to the provisions of chapter 189, p. 289, of the Laws of 1881. This referred to the lease of May 1, 1888, and pursuant thereto the commissioners of the sinking fund passed a resolution authorizing a surrender of that lease, and awarding a new lease for a period of 99 years at a nominal rental of $1 a year. Pursuant to these acts and resolutions, the leases were executed, each of which contained the following covenant:

"And the said party hereto of the second part further covenants and agrees that it will erect or cause to be erected or maintained upon the premises hereby demised, a building for the use of the hospital and for the reception and treatment of patients needing hospital treatment, and that said party of the second part will not make any charge or receive any compensation for the treatment of patients in any ward of the buildings which shall be erected on the hereby demised premises."

Subsequently, and pursuant to the provisions of chapter 166, p. 372, of the Laws of 1900, a grant of all of the premises held under the leases of plot 2 were conveyed by the city to the corporation. The terms of this act and the terms of the resolution and the deed pursuant thereto vesting title in the corporation were in all respects the same as were the act, resolutions, and deed under which the grant was made of the plot 1. It is conceded that the plaintiff has been, since the change in its name, and now is, engaged in charitable work, and cares for a large number of charity patients, who would otherwise become a charge upon the city. In the main, it derives its funds from members, patrons' dues, legacies, bequests, and charitable gifts, and some revenue is derived from patients who pay. Since 1898 the city has paid a per capita

allowance of 60 cents per day for each free hospital or surgical patient. Pursuant to the statement contained in its petition to the commissioners of the sinking fund for a grant, the corporation has purchased the block of land mentioned therein, and conducts its hospital and charitable work upon an enlarged scale at that place, and commensurate with the accommodations which it has to offer. On December 6, 1901, the corporation and the defendant entered into a contract, whereby the plaintiff agreed to sell and the defendant to purchase the Lexington avenue property, which was the property the corporation received from the city, for the sum of $425,000, on the purchase price of which $20,000 was paid in cash upon the execution of the contract, and $30,000 additional was paid on the 29th day of January, 1902. The remainder was to be paid in cash, and mortgages to be given upon the different subdivisions of the property. The title known as "Lot No. 1 of plot 2," was passed March 1, 1902, at which time the defendant accepted a deed therefor, and paid $10,000 additional in cash, and gave a purchase-money mortgage for $51,500. The title to the remainder of the land was to be passed at such time before November 1, 1903, as the corporation should elect. After the acceptance of the deed above mentioned, it was agreed between the parties that, should the title to the premises prove to be unmarketable, the corporation would accept a reconveyance of the same, cancel the mortgage, and repay all the moneys paid by the defendant upon the contract of purchase. Thereafter the parties agreed on the 13th day of July, 1903, as the time for closing the contract, at which time the plaintiff tendered its deed to the defendant of the remaining portion of the land, and demanded the execution of the purchase-money mortgages and the payment of the remainder of the purchase price as called for in the contract. The defendant rejected the title as tendered, claiming that the same was unmarketable, for the reason that it depended upon the leases and deeds heretofore mentioned from the city of New York; that the same were invalid, as having been made in violation of law and of the Constitution of the state, and that by reason thereof the corporation was unable to convey a marketable title.

It was suggested by the learned referee, and is argued by the respondent upon this appeal, that some consideration for the grants from the city of New York to the corporation is found in the fact that the land granted would be subject to taxation in the hands of a purchaser from the corporation. It is manifest that such fact cannot be deemed a consideration in any sense. If it could be construed as a valuable consideration, it would support a grant from the city by way of gift to a private individual, for in his hands it would immediately become the subject of taxation. Every conveyance could be supported under such consideration. The learned referee found that the grants were made for a good and valuable consideration, which he proceeds to recite as being services theretofore rendered in the treatment and care, without charge, of persons whose treatment would otherwise have been a charge and burden upon the city of New York, and for such service thereafter rendered in maintaining the hospital for the purposes described. As the evidence upon this subject is undisputed, such finding, although expressed as a finding of fact, is, for all essential

purposes, a conclusion of law.    Whether a valuable consideration sufficient to support these grants can be said to exist depends upon the legal results which necessarily flow from the entire transaction.    The incorporation of the plaintiff was voluntary.    It took upon itself the burden of discharging the obligation which it assumed.    The fact that in process of development it enlarged its scope and purposes, and thereunder discharged a public obligation which it would have been proper for the city to assume, did not create any legal obligation against the city.    Trustees of Exempt Firemen's Fund v. Roome, 93 N. Y. 313, 45 Am. Rep. 217.    The care of the poor and the aid which was rendered to poor people by the corporation is shown to be of a character which would have authorized the appropriation of public moneys in discharge of the obligation, and it is probably true that the city was authorized by general provisions of law, and also by the provisions of the statutes to which we have called attention, to recognize the discharge of such obligation by the corporation as creating a moral obligation against the city, which it might discharge by the payment of public moneys.    Wrought Iron Bridge Co. v. Attica, 119 N. Y. 204, 23 N. E. 542;    Matter of Straus, 44 App. Div. 425, 61 N. Y. Supp. 37.    The continued discharge by the corporation of such obligation would, as a necessary consequence, furnish the basis upon which the city could continue in recognition of the discharge of its public obligation, and thereby right would exist for the appropriation of public funds for its support within constitutional restraints.    This brings us to considering whether the grants of property in the present case can be sustained upon the consideration above mentioned, and whether the grant is permitted by the constitutional authority which allows the appropriation of public moneys for such a purpose.    Before adverting to the specific constitutional provision applicable to the subject, it is well to have clearly in mind the exact status of the corporation, and the relation of the city thereto.    Under the lease of plot 1, the act authorizing it was for the erection of a public hospital, and it contained a covenant to erect and maintain such hospital upon the demised premises, and also to keep it open at all times during the term of the lease for patients of all creeds and denominations, and it also contained a provision of forfeiture in the event that compliance was not had with these terms, conditions, and covenants.    At the time of the execution of this lease, the constitutional provision now embraced in section 10 of article 8 was not in existence, in consequence of which the power of the Legislature to authorize the appropriation of public moneys was very much broader than the constraints which the constitutional provision now places upon it.    Matter of Mahon v. Board of Education, 171 N. Y. 263, 63 N. E. 1107, 89 Am. St. Rep. 810.    The leases of plot 2 had different provisions, which we have already noticed.    These leases were made after the adoption of the constitutional provision.    Therefore it was that the terms of the act and the leases themselves contained much broader covenants, doubtless deemed to be essential in order to meet the constitutional restrictions.    There is, therefore, the express recital that the corporation is to undertake the discharge of rendering relief to patients needing hospital treatment, who would otherwise become a public charge, and that such treatment should be

free.   Forfeiture of these leases was attendant upon the failure to discharge by the corporation the covenants contained therein.   Under the
terms of the grants, however, all covenants of forfeiture, as well as all
others, were omitted, and in their place was substituted the clause contained in the resolution passed by the commissioners of the sinking
fund.   This covenant simply required the application of the proceeds
of the land conveyed to the support and maintenance of the corporation.
There could be no covenant of forfeiture, and at the same time invested in the corporation an absolute title, which it could convey to a purchaser subject to no conditions.   This condition the acts, resolutions,
and grants expressly recite.   The effect of the grant, so far as the corporation is concerned, was only to impose upon it the obligation of
applying the proceeds of the land to the discharge of its chartered obligations.   This was all it pledged itself to do in its petition asking for
the grant.   The language of this pledge is to apply the proceeds of
any sale which it makes to the purposes and objects of its incorporation,
"as set forth in its certificate of incorporation as modified by the
laws affecting the same."   The effect of the covenant and of the pledge
is therefore the same.   By reference to its certificate of incorporation,
which contains its chartered powers, it is seen to be as recited "that the
particular business, purpose, object of such association and society
will be medical and surgical aid to persons of the Jewish persuasion,
and for all other purposes appertaining to hospitals and dispensaries."
And, so far as its charter is concerned, this language has never been
broadened, nor has it been changed or modified by any legislative act.
It is true that in the constitution adopted by the corporation the limitation upon creed is stricken out, and in its place is substituted "all creeds
and nationalities," and the objects of the incorporation are very much
enlarged.   The constitution, however, is not a part of the corporation's
charter.   It may be modified, changed, and amended in accordance
with the rules and regulations providing therefor, without in the
slightest degree contravening the corporation's charter.   It can strike
therefrom the whole of the enlarged purpose by restricting corporate
acts to its limited charter provisions without in any legal sense affecting the pledge made in its petition asking for the grant, or violating any
covenant which is contained in the grants.   And if it made entire
departure from its present scheme, and declined to discharge a public
obligation in rendering aid to the poor, it would in no wise affect the
terms of the grant, or violate any of its covenants, or affect the title
to the lands in the hands of a bona fide purchaser.   The effect of this
would be an appropriation of public property ostensibly for a public
purpose, which might, nevertheless, be devoted to exclusively private
purposes.   Confessedly, an appropriation of public property cannot
lawfully be made to such use, and we are of opinion that it is equally
fatal to the grants that such may be the result.   The question is, not
what was the purpose, or what is the present condition, or how faithfully the corporation has discharged and is discharging its public obligation.   The vice lies in what may be done, and as to that it is clear
that the proceeds of these grants may be devoted to an exclusively
private purpose, and the city left remediless in prevention of it.   The
grants, therefore, operate in legal effect as a gift of public property for

a private use.  Section 10 of article 8 of the Constitution of the state of New York so far as material provides:

"No city * * * shall hereafter give * * * any property * * * to or in aid of any individual, association or corporation.  This section shall not prevent such * * * city * * * from making such provision for the aid or support of its poor, as may be authorized by law."

If we are correct in our construction of the effect of this grant, it is clearly void under this provision of the Constitution.

Aside from this question, however, is another, which readily forces itself upon the attention when the transaction is considered.  The constitutional provision above cited authorizes the appropriation of public funds for the aid and support of the poor.  Prior to the Constitution of 1894 the subject of charities had not found a place in the several Constitutions of the state.  The present Constitution, while making lawful the appropriation of public funds for these purposes, did not assume by that provision to regulate or control the subject.  Section 11 of article 8 made provision, among other things,.for a state board of charities, to be appointed by the Governor, and provided that existing laws relating to charitable institutions should remain in force, and be applicable thereto.  Section 14 of such article provides:

"Nothing in this Constitution contained shall prevent the Legislature from making such provisions for the education and support of the blind, the deaf and dumb, the juvenile infants, as to it may seem proper; or prevent any * * * city * * * from providing for the care, support, maintenance and secular education of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under private or public control. Payments by * * * cities to charitable institutions * * * wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the Legislature.  No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities. Such rules shall be subject to the control of the Legislature by general laws."

This section has been construed to authorize the payment of money to various institutions.  White v. Inebriates' Home, 141 N. Y. 123, 35 N. E. 1092; Sargent v. Board of Education of the City of Rochester, 177 N. Y. 317, 69 N. E. 722.  It is upon these cases and various others that the respondent relies to uphold these grants.  In each of them, however, it is noticeable that the questions involved the appropriation of money and the payment of current funds for the public purpose.  It is the evident policy of the state to deal in connection with such institutions, having regard to the continued discharge of the public functions and providing funds to aid in the discharge of current obligations created thereby.  The appropriation and payment of money from time to time as necessity requires enables the city at all times to control the proper application of the proceeds and to increase, diminish or withhold the amount appropriated in accordance with the needs of the institution, and the fulfillment upon its part of the public obligation which it has assumed.  The purpose is to make compensation for the discharge of such obligation, and when it ceases its operations or becomes inefficient in the discharge of the public function courts will not compel payment out of the public funds, even though there be in existence a statute requiring the public authorities to make payment.

People ex rel. Inebriates' Home v. Comptroller, 152 N. Y. 399, 46 N. E. 852. The language of section 14 of the Constitution clearly contemplates payment of money for these purposes, to be applied subject to the rules and regulations established by the board of charities. This is now the authority for the application of property and money in aid of private institutions that have voluntarily assumed the public obligation, and the provision is that no "payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities"; thus clearly contemplating that the basis of the appropriation shall have relation to the number of inmates provided for in the particular institutions, the rate of payment being placed upon a per capita basis. Such is the scheme of these enactments, and such have been the cases where the obligation of payment has been assumed and enforced. The grant in the present case does not appropriate money upon such basis, nor does it devote the land to the use of the corporation for its corporate purposes. In effect, it gives the land to be sold for the purpose of creating a fund, which in all essential characteristics operates as an endowment of the institution to the extent of the fund to be derived from the sale of the land. Neither the city nor the board of charities has control of such fund or its expenditures. It is handed over to the institution bodily, to be expended in its discretion for the purposes mentioned. The supervisory control given to the board of charities does not reach such fund, nor control the same in disposition. The control of the board of charities has relation to the inmates, and the limitation is that payment may not be made if such inmate be not received and retained pursuant to rules established by the board. So that this fund produced by these grants passes irrevocably to the corporation, to be used in its discretion, and subject to no other covenant or pledge upon its part than an agreement to use it for its chartered purposes, which may be, under such charter, private and denominational. The result of such condition is that, so far as appropriations are based upon per capita relief afforded by the institution, the most stringent safeguards surround the expenditure of moneys so appropriated, and none can be made unless compliance be had with such provisions of law. If, however, the present grants be sustained, it must follow that lands may be conveyed, or moneys without limit appropriated as endowments for these institutions, without any control or supervision in disposition by any public authority or board. The corporation itself furnishes the best illustration. The city appropriates, and has since 1898, 60 cents per day for each free hospital or surgical patient. The Constitution provides that such moneys shall not be paid to this institution unless it makes compliance with the rules of the state board of charities. Under these grants it obtains property which it has sold for $425,000, and, if the grant be sustained, this fund it may receive and appropriate in the discretion of the governing body of the corporation. Clearly, such a result was never contemplated by the framers of the Constitution. Nor has any case, so far as we are able to find, supported such a grant. On the contrary, the expression of the courts upon that subject is to the effect that all appropriations must be subject to control by the state board of charities, and such is the constitutional provision. To sustain

these grants, therefore, would be again to open the door to the evils which arose prior to the constitutional prohibitions upon the Legislature, which were passed to remedy such evil.  We have no doubt but that the present corporation is worthy of the aid which the Legislature has authorized, and which the city has attempted to give, and that it is discharging and will continue in the discharge of the public obligation which it has voluntarily assumed; but such facts cannot be considered in sustaining a gift or in authorizing an endowment which is opposed to the public policy of the state as expressed in organic law.  We reach the conclusion, therefore, that these grants are in all essential respects gifts and endowments, and that as such they are in violation of the constitutional provisions of the state.  This conclusion, therefore, renders this title unmarketable.

As the parties have stipulated that the one succeeding shall have an affirmative judgment, it necessarily follows that the judgment should be reversed, and judgment should be ordered in favor of the defendant upon his counterclaim; costs to the defendant of this appeal and of the action.  All concur.