In the Matter of WARREN Ross et al., Petitioners, against LEWIS A. WILSON, as Commissioner of Education of the State of New York, et al., Respondents.

Supreme Court, Special Term, Albany County, January 29, 1954.

*Alton R. Erickson* for petitioners.

*Charles A. Brind, Jr.,* and *John P. Jehu* for Lewis A. Wilson, as Commissioner of Education, respondent.

*Robert G. Wright* for Board of Education, respondent.

BOOKSTEIN, J.   Central School District No. 1 of the Towns of Ellicott, Ellington, Poland, Gerry and Carroll, Chautauqua County (hereinafter, for convenience and brevity, referred to as " Central District "), was organized pursuant to article 37 of the Education Law at some time prior to July 1, 1952.

Common School District No. 1 of the Towns of Ellicott and Gerry, Chautauqua County (hereinafter, for convenience and brevity, referred to as " Common District "), became a part of Central District upon its formation as such.

At that time there existed in and was being conducted in Common District a schoolhouse.   Its operation was continued by Central District in compliance with the provisions of section 1805 of the Education Law, which required Central District to " continue to maintain a school for the instruction of pupils therein up to and including the sixth elementary grade in each existing district maintaining a school at the time of the organization of the central school district until such time as the legal voters of such existing district at a meeting of such voters * * * determine to discontinue the school in such existing district."

Upon the organization of Central District, officers of Common District, ceased to function, except to the limited extent provided for in section 1805 of the Education Law.

At a meeting of the qualified voters of Common District, held February 21, 1953, pursuant to notice, the voters were given the opportunity to vote on Proposition 1 of four propositions, and as many of the remaining three as might be necessary.

Proposition 1 was whether Common District should be discontinued, pursuant to section 1804 of the Education Law.

Proposition 2 was whether Common District should sell its existing schoolhouse to Ross Mills Church of God for $2,000.

Proposition 3 was whether Common District should sell its existing schoolhouse to Ross Grange #305 for $3,000.

Proposition 4 was whether or not its existing schoolhouse be sold at public auction.

Proposition No. 1 was carried by a vote of 33 to 28.

Proposition No. 2 was then submitted. During the debate thereon, a motion was made that Proposition No. 4, to wit, a sale at public auction be voted on but was ruled out of order. A motion to adjourn met a similar fate. A motion was then made to change the amount in Proposition 2 to $2,500 and that also was ruled out of order. One Warren Ross then made a cash offer of $4,000 for the property but was disregarded.

A vote then ensued on Proposition No. 2, the sale to Ross Mills Church of God for $2,000, which was carried 32 to 24.

Accordingly, no votes were taken on Propositions 3 or 4 or on the offer of Mr. Ross and the meeting adjourned.

The board of education of Central District thereupon entered into a written contract with Ross Mills Church of God for a sale of the schoolhouse property of Common District for $2,000 and prepared to execute and deliver a deed of the property in question to it upon payment of that sum.

Prior to said meeting, and on or about November 3, 1952, an appraisal in writing of the schoolhouse property had been obtained by the authorities of Central District, appraising its value at $2,500.

Subsequent to the meeting of February 21, 1953, and on or about March 21, 1953, an appraisal in writing was obtained, apparently by petitioners or some of them, appraising the value of the schoolhouse property at $4,200.

On or about February 24, 1953, some of petitioners, including Ross, filed with the board of education of Central District written objections to the proposed sale, dated February 24, 1953, and, as evidence of good faith, Ross repeated in writing his offer of $4,000 for the property.

The objections were of no avail, whereupon petitioners appealed to respondent, Commissioner of Education, pursuant to section 310 of the Education Law. Said respondent rendered his decision on or about September 25, 1953, dismissing the appeal of petitioners, who have instituted this article 78 proceeding to review such determination.

The problem posed in this proceeding appears to be one of first impression.

Respondents contend that the determination of respondent Commissioner of Education is final and not subject to judicial review, by virtue of the provisions of section 310 of the Education Law. There are innumerable matters arising under the Education Law in which the determination of the commissioner is final and not subject to judicial review. This court is constrained to hold that this dispute does not fall within that category and that the dispute here presented is subject to judicial review.

The sale of a schoolhouse property of a common school district, in a situation such as here exists, is governed by subdivision 6 of section 1804, which, so far as pertinent, provides as follows:

" The board of education shall not sell or otherwise dispose of the property of any such existing district " (in this instance, Common District) " except with the approval of a majority of the qualified voters of such existing district present and voting upon the question at a meeting of such voters duly called by such board of education. For that purpose the proceeds of such sale  *  *  *  shall be apportioned among the taxpayers of such existing district ".

It is to be noted that the section of the law last above quoted makes no provision for the manner or terms of sale. It is entirely silent on that subject. Respondent commissioner has approved the right of the voters to sell for the lowest amount offered for the property on the ground, first, that the sale price of $2,000 bears a reasonable relationship to the appraisal of $2,500 and, second, that the majority of voters have the right, under section 402 of the Education Law, to fix the price and terms and that the provisions thereof are applicable to a sale under subdivision 6 of section 1804 of the Education Law.

Section 402 of the Education Law does empower the qualified voters of Common District " by a majority of the votes of those present and voting, to direct the sale of the *former site or lot,* and the buildings thereon  *  *  *  *at such price and upon such terms as they shall deem proper* ". (Emphasis supplied.) It is that provision which respondents maintain justifies the sale here attempted under subdivision 6 of section 1804 of the Education Law. Assuming, and without so deciding, that such a sale as is here sought to be made, is possible under section 402 of the Education Law, I am of the opinion that section 402 has no application to a sale under subdivision 6 of section 1804.

Section 402 is a part of article 9 of the Education Law, dealing primarily with the *designation and changes* of schoolhouse sites.

Thus section 401 regulates the manner in which a school district designates sites and changes an existing site. Section 402 providing for the sale of a schoolhouse site, comes into operation *only* " Whenever the site of a schoolhouse shall have been changed, as herein provided," i.e., as provided in section 401.

Here we are not dealing with a change of site at all. Here we are dealing with the liquidation of a district that is terminating its existence.

Where a sale occurs under section 402, the proceeds are retained by the school district, making the sale, to be applied to its general uses and purposes. When a sale is made under subdivision 6 of section 1804 the proceeds are divided, as therein provided, among certain taxpayers. In the latter case, too, the taxpayers of the former Common District continue liable for its indebtedness existing at the time when centralization took effect. (Education Law, § 1804, subd. 5.)

I find nothing in section 2021 of the Education Law, cited by respondents, as conferring upon the voters of Common District, the right or power to do that which they have attempted to do here. The same is true as to sections 2023, 2024 and 416 of the Education Law cited by them.

Nor is this a dispute as to the validity of a district meeting, as to which a determination of the commissioner is final under section 2037 of the Education Law. Here no question is raised as to the validity of the meeting. Here, rather, the question is raised as to the power of the voters to do what they did, at a valid meeting. The dispute here is as to the right of a majority of qualified voters to sell property for less than a higher sum obtainable therefor, when the proceeds of the sale belong, not to the district, but only to the taxpayers thereof against the will of a minority of such voters and without a voice or vote of those taxpayers who are neither residents nor voters of the district.

Respondents also seek to justify the action taken by virtue of the provisions of subdivision 11 of section 1709 of the Education Law, which so far as pertinent empowers the sale of " any real estate the title to which is vested in the board * * * at such price and upon such terms as said voters shall prescribe ". Section 1709 is a part of article 35 of the Education Law, dealing exclusively with union free school districts and contemplates their continued existence as such and not their termination. That section, in my opinion, has no application to a sale under subdivision 6 of section 1804.

Respondents argue that section 1709 is applicable to a sale under subdivision 6 of section 1804, since subdivision 1 of section 1804 of the Education Law, which is a part of article 37 thereof and which article deals exclusively with central school district, provides that "Each * * * central school district * * * shall have the same powers and duties as boards of education in union free school districts as prescribed by this chapter." It may be noted that no similar provision is cited as to common school districts which are regulated by article 33 of the Education Law. And, in this instance, it is a common school district which is involved. Moreover, said section 1804 deals with the powers and duties of a board of education of a central school district and not with the rights and powers of voters of a common school district which has been absorbed into a central school district.

If the argument advanced by respondents, with reference to the applicability to a sale under subdivision 6 of section 1804 of sections 402 and 1709 has merit, then what becomes of the applicability of section 1520 of the Education Law? Under that section, when a district is divided into portions, which are annexed to other districts, its property is required to be sold by the supervisor of the town, within which its schoolhouse is situated, *at public auction* after at least five days' notice; the proceeds are applied to the debts of the district; and the residue is paid over to the taxpayers.

That is a much more parallel situation to the one that exists here. Section 1520 is a part of article 31 of the Education Law, dealing with all school districts, and it would seem far more logical to apply that section to the existing situation than to apply sections 402 and 1709, substituting for the supervisor of the town the board of education of Central District.

One thing is clear. The Education Law makes different provisions for sales of real property of a district under different situations.

Thus, section 402 regulates such sale in the case of a change of site; section 1520 regulates it in the case of the division of a district; subdivision 11 of section 1709 regulates it in the case of a union free school district, which continues to exist as such for all purposes; and subdivision 6 of section 1804 regulates it only in the case of a district which has become part of a central district and then decides to terminate its existence.

In the cases covered by sections 402 and 1709, it confers the power on a majority of the qualified voters to fix the terms; in the cases governed by section 1520, it requires a sale at public

auction; in the cases governed by subdivision 6 of section 1804 it confers no power on the voters to determine the terms of sale nor does it prescribe for the board of education of a central school district the manner of a sale by it.

The last section referred to is a limitation on the usual power of a board of education to sell at all, without approval of the voters of a district which has become a part of a central district school. It does not confer upon the voters a right to fix the terms of sale but does confer upon them the power to approve or disapprove a proposed sale.

The contention is advanced by petitioners that, if subdivision 6 of section 1804 authorizes the making of a sale, in the manner here attempted, the statute would be in contravention of section 1 of article 8 of the State Constitution which prohibits a school district from making a gift of property to any individual or private corporation or private undertaking; that in selling property for $2,000 for which it can obtain $4,000, it is in effect making a gift to the extent of $2,000, and that if such power exists, it contravenes the constitutional prohibition against gifts; that such a sale as is here attempted violates the due process provision of the United States Constitution, in that a majority is taking property from a minority, without due process, since there are taxpayers, who are not voters, such as corporations and nonresidents, whose property rights are being invaded, without notice and without a voice or a vote. (Cf. *Carpenter* v. *Wise*, 92 Misc. 246; *Mt. Sinai Hosp.* v. *Hyman*, 92 App. Div. 270; *Stuart* v. *Palmer*, 74 N. Y. 183; *Hollenbach* v. *Born*, 238 N. Y. 34; *Gilman* v. *Tucker*, 128 N. Y. 190, and *Gardner* v. *Ginther*, 232 App. Div. 296, affd. 257 N. Y. 578.) The contentions thus advanced are not without merit but it is not necessary to determine the questions thus raised, since I have reached the conclusion that there was no legislative intent in the enactment of section 1804, to confer on the voters the powers which they have here attempted to exercise.

As I view it, when the voters passed Proposition No. 1 discontinuing the Common District, their power, for the time being, was ended. It then became the duty of the board of education of Central District, to endeavor to find a purchaser; that in so doing, it was acting in a fiduciary capacity, for the best interests of the beneficiaries of the proceeds of the sale, to wit, the taxpayers of Common District; that it is its duty to obtain the highest possible price by the means most likely to produce it; that the sale then be made, subject to the approval of the

voters; that the voters then have the power, pursuant to subdivision 6 of section 1804 to vote as to whether or not to approve a proposed sale, arrived at in the manner indicated. Whether the method should be by sealed bids after adequate advertising or at public auction after such advertising or by some other or better method calculated to obtain the highest price, is a matter that would have to be left to the discretion of the board in the absence of specific statutory regulation.

In passing, it should be said that there can be no doubt of the worthiness of the motives of the majority of the voters in this matter. However lofty their motives may have been, it seems to me they lacked the power to impose their will upon the minority or upon the taxpayers, who have no voice or vote, and whose property they were attempting to give away, in part at least, without their consent.

The determination of the respondent, commissioner, is annulled; the action of respondent, board of education, in making the contract in question is likewise annulled.

Submit order.