TRAVERSE CITY SCHOOL DISTRICT

*v.*

ATTORNEY GENERAL

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — CONSTRUCTION — STATUTES — TECHNICAL RULES.

   Technical rules of statutory construction do not apply to the construction of a constitution.

2. CONSTITUTIONAL LAW—CONSTRUCTION—COMMON UNDERSTANDING—INTENT.

   The primary rule of construction of a constitution is the rule of "common understanding" and the interpretation that should be given it is that which reasonable minds, the great mass of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 59.
[2, 30] 16 Am Jur 2d, Constitutional Law § 75.
[3] 16 Am Jur 2d, Constitutional Law § 87.
[4] 16 Am Jur 2d, Constitutional Law § 58 *et seq.*
[5, 6] 16 Am Jur 2d, Constitutional Law §§ 417, 418.
   47 Am Jur, Schools § 222.
[7, 8, 10–12, 20, 23, 32–37] 47 Am Jur, Schools § 222.
[9, 24, 26] 16 Am Jur 2d, Constitutional Law §§ 338–340.
   47 Am Jur, Schools § 222.
[13–16, 40] 47 Am Jur, Schools § 189 *et seq.*
[17, 25, 27, 28] 47 Am Jur, Schools §§ 189–200, 222.
[18] 47 Am Jur, Schools §§ 83, 189, 222.
[19, 41] 47 Am Jur, Schools §§ 220, 222.
[21, 45] 51 Am Jur, Taxation § 620.
[22] 47 Am Jur, Schools § 6.
[29] 5 Am Jur 2d, Appeal and Error § 1028.
[31] 47 Am Jur, Schools §§ 208, 222.
[38] 16 Am Jur 2d, Constitutional Law §§ 75, 87.
[39] 16 Am Jur 2d, Constitutional Law §§ 75, 87.
   47 Am Jur, Schools § 155.
[42] 39 Am Jur, Parent and Child § 15.
   47 Am Jur, Schools § 6.
[43] 47 Am Jur, Schools §§ 6–8.
[44] 51 Am Jur, Taxation §§ 495, 539, 546.
[46] 16 Am Jur 2d, Constitutional Law §§ 335, 338–340, 485–493, 542–547.

the people themselves, would give it; as the intent to be arrived at is that of the people who ratified it.

3. CONSTITUTIONAL LAW—CONSTRUCTION—CIRCUMSTANCES OF ADOPTION—PURPOSE.

A rule of construction of a constitution is that, to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered.

4. CONSTITUTIONAL LAW—CONSTRUCTION—INTERPRETATION—VALIDITY.

A rule of construction of a constitution is that, wherever possible, an interpretation that does not create constitutional invalidity is preferred to one that does.

5. STATUTES—STATE SCHOOL AID ACT—CONSTITUTIONAL LAW—CONSTRUCTION—CIRCUMSTANCES OF ADOPTION—COMMON UNDERSTANDING—SCHOOLS AND SCHOOL DISTRICTS—NONPUBLIC SCHOOLS—PUBLIC FUNDS.

Chapter 2 of the State School Aid Act is unconstitutional as of December 19, 1970, the effective date of a constitutional amendment which prohibits the use of public funds "directly or indirectly to aid or maintain" a nonpublic school, as this language, read in the light of the circumstances leading up to and surrounding its adoption and the common understanding of the words used, prohibits the purchase of educational services from a nonpublic school with public funds and any credits accumulated on or after that date are invalid (Const 1963, art 8, § 2; MCLA § 388.665 *et seq.*).

6. STATUTES—STATE SCHOOL AID ACT—CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—NONPUBLIC SCHOOLS—PUBLIC FUNDS.

Payments to eligible units, as defined in chapter 2 of the State School Aid Act, or credits accumulated were and are valid and constitutional, whether already disbursed or hereafter paid out, from September 1, 1970, the date the Michigan Supreme Court declared that statute constitutional, to and including December 18, 1970, the date before the effective date of a constitutional amendment which prohibits the use of public funds "directly or indirectly to aid or maintain" a nonpublic school (Const 1963, art 8, § 2; MCLA § 388.665 *et seq.*).

7. Schools and School Districts—Nonpublic School Students—Shared Time—Public School Premises—Public School District —Constitutional Law.

A shared time program of elementary or secondary instruction or educational services to nonpublic school students, offered on the premises of a public school, is not invalidated by a prohibition in a constitutional amendment against aiding a nonpublic school since it is under the complete control of the public school district and provides only incidental aid, if any (Const 1963, art 8, § 2).

8. Constitutional Law—Schools and School Districts—Nonpublic School Students—Shared Time—Public Schools.

A constitutional amendment which precludes monies to "support the attendance of any student * * * at any such nonpublic school" does not prohibit any support to a nonpublic school student from participating in a shared time program at a public school as it would be only remotely incidental to his attendance at the nonpublic school (Const 1963, art 8, § 2).

9. Constitutional Law—Public Monies—Nonpublic School Students—Conflicting Provisions—Discrimination—Free Exercise of Religion—Equal Protection—Severability.

In a provision in a constitutional amendment prohibiting public money "to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students", the clause "or at any location or institution where instruction is offered in whole or in part to such nonpublic school students" is unconstitutional, void and unenforceable because it contravenes the free exercise of religion guaranteed by the United States Constitution and is violative of the equal protection of the laws provisions of that Constitution; however, the unconstitutional portion is severable and capable of being removed from that section of the constitution without altering the purpose and effect of the balance of the sentence and section (Const 1963, art 8, § 2).

10. Schools and School Districts—Nonpublic School Students—Shared Time—Premises Used as Public School—Nonpublic Schools—Constitutional Law.

The valid portion of a constitutional amendment does not prohibit funds for nonpublic school students receiving shared time services upon premises occupied by lease or otherwise for public school purposes under the authority, control and operation of

the public school system by public school personnel as a public
school open to all eligible to attend a public school as they
are public schools even though the lessor or grantor is a non-
public school and even though the premises are contiguous
or adjacent to a nonpublic school (Const 1963, art 8, § 2).

11. SCHOOLS AND SCHOOL DISTRICTS—SHARED TIME—NONPUBLIC
SCHOOLS—CONTROL BY PUBLIC SCHOOL AUTHORITIES.

Prohibitions of the valid portions of a constitutional amendment
do not proscribe shared time at a nonpublic school where the
ultimate and immediate control of the subject matter, the
personnel and premises are under the public school system
authorities and the courses are open to all eligible to attend
a public school (Const 1963, art 8, § 2).

12. SCHOOLS AND SCHOOL DISTRICTS—SHARED TIME—NONPUBLIC
SCHOOL PREMISES—PUBLIC SCHOOL EMPLOYEES.

The constitutional amendment, known as Proposal C, does not
prohibit "incidental" or casual occasions of shared time in-
struction upon nonpublic school premises, for example, special
limited courses by experts in the employ of the public school
system or public instruction at a planetarium or art collection
of a nonpublic school, nor does it prohibit regular visitations
by non-instructional public school employees provided the pur-
pose of the visitation is otherwise proper and they are not
so extensive as to constitute the nonpublic school as the regular
and usual work station of the public school employees (Const
1963, art 8, § 2).

13. WORDS AND PHRASES—AUXILIARY SERVICES—STATUTES—SCHOOL
CHILDREN—HEALTH AND SAFETY MEASURES.

Auxiliary services, by statutory definition and practical applica-
tion, are special educational services designed to remedy phys-
ical and mental deficiencies of school children and provide
for their physical health and safety and, functionally, they
are general health and safety measures (MCLA § 340.622).

14. WORDS AND PHRASES—DRIVERS TRAINING—HEALTH AND SAFETY
MEASURES—STATUTES.

Drivers training, from a functional point of view, is a general
health and safety measure as the state interest in providing
driving instruction to high school age youth is to enable
neophyte drivers to safely handle an automobile in order to
protect themselves and other citizens from injuries caused by
actions of improperly trained drivers and the legislature treats

drivers education as a general safety measure rather than an educational matter since the act which created the program was an amendment to the Michigan Vehicle Code (MCLA § 257.811).

15. CONSTITUTIONAL LAW—AUXILIARY SERVICES—HEALTH AND SAFETY MEASURES—PRIVATE SCHOOL STUDENTS—SHARED TIME—PUBLIC AUTHORITIES—PUBLIC FUNDS—PRIVATE SCHOOLS.

Auxiliary services are general health and safety measures having only an incidental relation to the instruction of private school children; they are related to educational instruction only in that by design and purpose they seek to provide for the physical health and safety of school children or they treat physical and mental deficiencies of school children so that those children can learn like their normal peers; they are similar to shared time instruction in that private schools exercise no control over them as they are performed by public employees under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school; consequently, the prohibitions of a constitutional amendment known as Proposal C which are keyed into prohibiting the passage of public funds into private school hands for the purposes of running the private school operation are not applicable to auxiliary services (Const 1963, art 8, § 2).

16. STATUTES—AUXILIARY SERVICES—HEALTH AND SAFETY MEASURES —CONSTITUTIONAL LAW.

The clause in the auxiliary services act that auxiliary services include "such other services as may be determined by the legislature" does not give the legislature a blank check to make any service a health and safety measure outside the reach of a constitutional amendment simply by calling it an auxiliary service (Const 1963, art 8, § 2; MCLA § 340.622).

17. CONSTITUTIONAL LAW—CONSTRUCTION—PUBLIC EXPENDITURES— NONPUBLIC SCHOOLS—EDUCATIONAL PURPOSES—GOVERNMENTAL AC- TIVITIES—GENERAL WELFARE ACTIVITIES.

A constitutional amendment prohibiting public expenditures to support the employment of persons at nonpublic schools, being a part of the educational article of the constitution, means employment for educational purposes only and does not include policemen, firemen, nurses, counsellors and other persons engaged in governmental, health and general welfare activities as such an interpretation would place nonpublic

schools outside of the sovereign jurisdiction of Michigan (Const 1963, art 8, § 2).

18. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—FEDERAL FUNDS—PUBLIC MONIES—TRUSTS—AUXILIARY SERVICES—HEALTH AND SAFETY MEASURES.

A constitutional amendment which prohibits public monies to aid a private school, support the attendance of a student at a nonpublic school or support the employment of a person at a nonpublic school does not disallow a public school district from participation in any Federal program of special educational benefits in the form of services or equipment, designed to aid educationally deprived elementary and secondary school children, because the nature of the services are similar to auxiliary services, they are health and safety measures, the Federal funds do not become public monies when they are transmitted to the public school district but are impressed with a trust and must be used by state agencies in accordance with Federal guidelines and for the purposes for which the funds were granted, and the phrase "public monies" in the constitutional amendment refers only to state resources and does not include Federal funds (Const 1963, art 8, § 2; 20 USC § 241a *et seq.*).

19. CONSTITUTIONAL LAW—FOSTER HOMES—NONPUBLIC SCHOOLS—PUBLIC SCHOOLS.

Foster homes are special institutions for special children, they are in no way a private substitute for a public school, they are not "nonpublic schools," within the ordinary understanding of that term and such homes, which provide incidental educational services, fall outside the scope of "any private, denominational or other nonpublic pre-elementary, elementary or secondary school" for purposes of the prohibitions in a constitutional amendment against public aid or maintenance, support of attendance and employment of persons at such schools (Const 1963, art 8, § 2; MCLA § 712A.18).

20. CONSTITUTIONAL LAW—CONSTRUCTION—TAX EXEMPTIONS—PARENTS OF PRIVATE SCHOOL CHILDREN—PRIVATE SCHOOLS.

A constitutional amendemnt providing for no "credit, tax benefit, exemption or deduction" was designed to outlaw personal tax exemptions for parents of private school children but not tax exemptions for private schools (Const 1963, art 8, § 2).

21. Taxation—Tax Exemptions—Appropriations—Public Monies
—Nonpublic Schools—Constitutional Law.

> A tax exemption granted to a nonpublic school is not unconstitutional even though it may directly or indirectly "aid or maintain" the nonpublic school since tax exemptions are not appropriations or payments of public monies nor the utilization of public credit and, had the people intended to withdraw from nonpublic schools any tax exemptions, benefits or credits, they would have placed appropriate language in the first sentence of the constitutional amendment, known as Proposal C (Const 1963, art 8, § 2).

22. Constitutional Law—Parents—Children—School of Choice
—Equal Protection.

> The constitutional amendment, known as Proposal C, involves the fundamental right, protected by the Fourteenth Amendment, of a parent to send his child to the school of his choice if it meets the state quality and curriculum standards (US Const, Am 14; Const 1963, art 8, § 2).

23. Schools and School Districts—Public Monies—Nonpublic School Students—Public Schools—Shared Time—Auxiliary Services—Nonpublic Schools—Constitutional Law.

> The constitutional amendment, known as Proposal C, serves the state interest of precluding public expenditures for private schools but cannot bar nonpublic school students from shared time or auxiliary services at a public school, as it is unnecessary to achieve the purpose of prohibiting public monies to nonpublic schools (Const 1963, art 8, § 2).

24. Schools and School Districts—Religion—Nonpublic School Students—Public Schools—Shared Time—Auxiliary Services
—Constitutional Law.

> The constitutional amendment, known as Proposal C, serves the state interest of preventing state sponsorship of religion or excessive entanglement between church and state but it is self-evident that it would be inappropriate to deny nonpublic school students access to shared time and auxiliary services at public schools on the basis of that state interest (Const 1963, art 8, § 2).

25. Constitutional Law—Equal Protection—Shared Time—Auxiliary Services—Nonpublic School Students—Public Schools.

> Excluding private school children from receiving shared time instruction or auxiliary services at the public school is a denial

of the constitutional right of equal protection; this does not mean that a public school district must offer them but, if it does offer them to public school children at the public school, nonpublic school students also have a right to receive them at the public school.

26. CONSTITUTIONAL LAW—CLASSIFICATION—FREE EXERCISE OF RELIGION—COMPELLING STATE INTEREST—PRIVATE SCHOOL STUDENTS—SHARED TIME—AUXILIARY SERVICES—PUBLIC SCHOOLS.

The constitutionally protected right of the free exercise of religion is violated when a legal classification has a coercive effect upon the practice of religion without being justified by a compelling state interest and a private school student has a burden imposed upon his right to freely exercise his religion which is not justified by compelling state interests advanced by a constitutional amendment, known as Proposal C, when he is denied participation in publicly funded shared time or auxiliary services offered at the public school because of his status as a nonpublic school student and he attends a private school out of religious conviction (US Const, Am 1; Const 1963, art 8, § 2).

27. SCHOOLS AND SCHOOL DISTRICTS—SHARED TIME—NONPUBLIC SCHOOL STUDENTS—DISCRIMINATION—PUBLIC SCHOOLS—NONPUBLIC SCHOOLS—CONSTITUTIONAL LAW.

Nonpublic school students are not unconstitutionally discriminated against if shared time instruction is available at public schools but not at nonpublic schools so long as they have access to shared time instruction at the public school.

28. SCHOOLS AND SCHOOL DISTRICTS—AUXILIARY SERVICES—DRIVERS TRAINING—HEALTH AND SAFETY MEASURES—NONDISCRIMINATORY BASIS.

Auxiliary services and drivers training are general health and safety measures which must be given on a nondiscriminatory basis to all children.

OPINION DISSENTING IN PART AND CONCURRING IN PART

T. M. KAVANAGH, C. J., AND T. G. KAVANAGH, J.

29. CONSTITUTIONAL LAW—CERTIFIED QUESTIONS—DISMISSAL AND NONSUIT.

*A case to review certified questions on the effect of a constitutional amendment, known as Proposal C, should be dismissed with prejudice as the people have the right to change their constitution but must do it in a proper, legal way and a new*

*doctrine called "election cures errors" fails to satisfy either logic or law, and should be rejected (Const 1963, art 8, § 2).*

OPINION DISSENTING IN PART AND CONCURRING IN PART
ADAMS, J.

See Headnotes 1 through 4.

30. CONSTITUTIONAL LAW—CONSTRUCTION—PLAIN MEANING.
*The first rule a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as understood by the people who adopted it.*

31. CONSTITUTIONAL LAW—CONSTRUCTION—PRIVATE SCHOOLS—STATE INVOLVEMENT—TRANSPORTATION TO SCHOOLS.
*The language of the constitutional amendment, known as Proposal C, is clearly aimed at no involvement by the state in private schools in whatever form it might take with the one exception that the legislature could provide for the transportation of students to and from any school (Const 1963, art 8, § 2).*

32. SCHOOLS AND SCHOOL DISTRICTS—NONPUBLIC SCHOOL STUDENTS— SHARED TIME—DUAL ENROLLMENT—PUBLIC SCHOOLS—CONSTITUTIONAL LAW.
*Shared time or dual enrollment programs of elementary or secondary instruction or educational services to nonpublic school students at the public school is not precluded by a constitutional amendment known as Proposal C (Const 1963, art 8, § 2).*

33. SCHOOLS AND SCHOOL DISTRICTS—NONPUBLIC SCHOOL STUDENTS— SHARED TIME—DUAL ENROLLMENT—NONPUBLIC SCHOOL PREMISES —CONSTITUTIONAL LAW.
*Shared time or dual enrollment programs of elementary or secondary instruction or educational services to nonpublic school students on nonpublic school premises is precluded by a constitutional amendment known as Proposal C (Const 1963, art 8, § 2).*

34. SCHOOLS AND SCHOOL DISTRICTS—LEASED PREMISES—PUBLIC SCHOOL PREMISES—CONSTITUTIONAL LAW—FUTURE DETERMINATION.
*The question whether or not so-called leased premises constitute a bona fide portion of the public school premises or are merely a device to attempt to circumvent the prohibitions of a constitutional amendment, known as Proposal C, should be left to future determination on a case-by-case basis (Const 1963, art 8, § 2).*

35. Schools and School Districts—Shared Time—Private Schools—Public Monies—Nonpublic School Students—Constitutional Law.

> *Shared-time programs in private schools would constitute the use of public moneys to aid or maintain such school in their operations and would tend to support the attendance of students at such nonpublic schools as, once the door is open to shared-time programs in private schools, it would be a simple matter, by the use of such programs, to achieve all the objectives attempted by parochiaid and to defeat completely what the people attempted to achieve by adopting the constitutional amendment known as Propossal C (Const 1963, art 8, § 2).*

36. Constitutional Law—Shared Time—Private School Students—Public Schools.

> *The constitutional amendment, known as Proposal C, does not prohibit shared-time instruction for private school students in the public schools, as in such a situation, the so-called shared-time student is nothing more than a part-time public school student and his status is no different from that of any other student who is enrolled less than full time (Const 1963, art 8, § 2).*

37. Schools and School Districts—Students—Public Schools—Nonpublic Schools.

> *Students who attend both public school and nonpublic school for different courses of study are both public and nonpublic school students and a student's status at a given time should be determined by the school he attends but there is nothing about attendance at a public school or private school that justifies tagging a student as belonging exclusively to one or the other as a student attending public school, even for only a portion of the day, is a public school student while attending public school classes.*

38. Constitutional Law—Construction—Plain Meaning—Common Understanding—Circumstances Surrounding Adoption—Constitutional Invalidity—Students—Status.

> *All rules of constitutional construction as to the meaning of a constitutional amendment, known as Proposal C, are violated if place of attendance is not used as the test of student status because of (1) failure to give effect to the plain meaning of the words of the amendment as understood by the people who adopted it—the "common understanding"; (2) failure to take account of the circumstances surrounding the adoption of the*

*amendment; and (3) ignoring an interpretation that does not create constitutional validity by the Michigan Supreme Court going out of its way to adopt an interpretation that does (Const 1963, art 8, § 2).*

39. CONSTITUTIONAL LAW—PLAIN MEANING AND INTENT—PRIVATE SCHOOLS—PUBLIC SCHOOLS—EQUAL PROTECTION—PUBLIC SCHOOL STUDENTS—PRIVATE SCHOOL STUDENTS.

*The language of the constitutional amendment, known as Proposal C, and the prohibitions therein contained are aimed at private schools and institutions and to expand the prohibitions as applying to public schools runs counter to the plain meaning and intent of the amendment and of the language used; and Federal and state equal protection guarantees require that programs offered in the public school be made available to all students, whether from public or private schools, on an equal basis (Const 1963, art 8, § 2).*

40. SCHOOLS AND SCHOOL DISTRICTS—AUXILIARY SERVICES—HEALTH AND SAFETY MEASURES—CONSTITUTIONAL LAW.

*Auxiliary services, being general health and safety measures, are not within the reach of the prohibitions contained in a constitutional amendment, known as Proposal C (Const 1963, art 8, § 2).*

See Headnote 18.

41. CONSTITUTIONAL LAW—FOSTER HOMES—SCHOOLS AND SCHOOL DISTRICTS—PUBLIC MONIES.

*A school is a school, whether conducted by a private foster home, by a church, or by the state; therefore, the prohibitions of a constitutional amendment, known as Proposal C, which are against the expenditure of public moneys "to aid or maintain any private denominational or other nonpublic, preelementary, elementary or secondary school" and against payment "to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students" precludes the payment of public moneys to private foster homes to provide educational facilities and instruction for the minor who resides in the home (Const 1963, art 8, § 2).*

42. INFANTS—DEPENDENT AND NEGLECTED CHILDREN—WARDS OF STATE—STATE INSTITUTIONS—FOSTER HOMES.

*Neglected or dependent children are wards of the state to whom the state owes a special obligation especially the neglected*

*child who, through no fault of his own, lacks a proper home atmosphere and, in fulfilling its obligation, some children are sent to state institutions and others are placed in private foster homes.*

43. Schools and School Districts—Free Public Schools—Discrimination—Neglected or Dependent Children—Private Schools.

*The responsibility to provide schooling for all children is a state responsibility, specifically enunciated in the first paragraph of an article of the Michigan Constitution, wherein the legislature is required to maintain and support a system of free public elementary and secondary schools * * * without discrimination as to religion, creed, race, color or national origin and this responsibility cannot be shifted to private institutions at public expense without undue discrimination as to the neglected or dependent children who are sent to those institutions and are thereby relegated to private schooling wholly outside the bounds of the state's constitutional responsibility (Const 1963, art 8, § 2).*

44. Taxation—Tax Exemptions—Parents—Constitutional Law.

*A constitutional amendment, known as Proposal C, denies to parents any tax exemption, including but not limited to any exemption or exemptions from property, income, sales, use, franchise, intangibles, inheritance, "in lieu of," or any other tax or taxes (Const 1963, art 8, § 2).*

45. Taxation—Tax Exemptions—Nonpublic Schools—Constitutional Law.

*A constitutional amendment, known as Proposal C, does not deny to nonpublic schools any tax exemption, including but not limited to any exemption or exemptions from property, income, sales, use, franchise, intangibles, inheritance, "in lieu of," or any other tax or taxes allowed them (Const 1963, art 8, § 2).*

46. Constitutional Law—Construction—Due Process—Equal Protection—Free Exercise of Religion.

*A constitutional amendment, known as Proposal C, does not violate the due process of law or equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States or of the right to free exercise of religion and other enumerated rights guaranteed by the First Amendment to the Constitution of the United States as made applicable to the State of Michigan through the Fourteenth Amend-*

ment to the Constitution of the United States (US Const, Ams
1, 14; Const 1963, art 8, § 2).

Certified question from Grand Traverse, James
M. Fitzpatrick, J. Submitted January 5, 1971. (No.
19 January Term 1971, Docket No. 53,144.) Decided
March 31, 1971.

Complaint by Traverse City School District
against the Attorney General and others, seeking a
declaratory judgment regarding an amendment to
Const 1963, art 8, § 2 in relation to the existing
shared time and auxiliary services provided by
plaintiff for non-public students who reside within
the school district. Request by Governor William G.
Milliken, pursuant to GCR 1963, 797, for answers to
certified questions concerning that constitutional
amendment. St. Francis School and others inter-
vened as defendants. Richard Henry Crampton and
others intervened as plaintiffs. Answers to certified
questions 1 through 7 certified to circuit court for
disposition in accord with Supreme Court opinion.

*Running, Wise & Wilson,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Solomon Bienen-
feld, Eugene Krasicky, Russell A. Searl,* and *Maxine
B. Virtue,* Assistant Attorneys General, for defend-
ants.

*Hubbell, Blakeslee & McCormick; William R. Con-
sedine, George E. Reed, Vincent C. Allred,* and
*Alfred L. Scanlan (Shea & Gardner* and *Charles N.
Whelan,* of counsel), for intervening defendants.

*Levin, Levin, Garvett & Dill* (by *Erwin B. Ell-
mann, Daniel G. Hoekenga,* and *Wallace K. Sagen-
dorph*), for intervening plaintiffs.

*Amici Curiae:*

The League of Women Voters of Michigan (by *Yvonne Y. Atkinson*).

Oakland Schools (by *MacLean, Seaman, Laing & Guilford*).

Michigan Association of School Administrators and Michigan Association of School Boards (by *MacLean, Seaman, Laing & Guilford*).

Board of Education of Lansing School District (by *Newman & Mackay*).

WILLIAMS, J.   This case arises from a declaratory judgment suit, brought by the Traverse City School District in the 13th Circuit Court against the Attorney General, and joined by all the appropriate parties in interest, to test the validity of the Attorney General's opinion, (OAG 4715) issued on November 3, 1970, which construes Proposal C, the constitutional initiative amendment prepared by the Council Against Parochiaid, as forbidding public monies for shared time and auxiliary services and expanded by counterclaims and cross-claims to include questions of Proposal C's impact upon private fosterhomes, Title I programs under the Federal Elementary and Secondary Education Act of 1965 and tax exemptions for nonpublic schools and the Federal constitutionality of Proposal C.   The case properly came before this Court pursuant to General Court Rule 797 on the request by the Governor to consider seven specific questions of public importance relating to the construction of Proposal C.   This Court ordered the Grand Traverse Circuit Court to certify these seven questions, and in its discretion added an eighth related question which will not be con-

sidered here, as it became the subject matter of a companion case, *Carman* v. *Secretary of State* (1971), 384 Mich 443.

In *Carman* v. *Secretary of State, supra,* this Court held that the result of the November 1970 referendum on Proposal C was to add the language of Proposal C as a second paragraph of Article 8, § 2 of the Michigan Constitution. This instant case therefore raises the question of the construction of Article 8, § 2 as amended. Article 8, § 2 originally read as follows:

"Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."

Proposal C added the following paragraph:

"No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school. No payment, credit, tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of public monies or property shall be provided, directly or indirectly, to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students. The legislature may provide for the transportation of students to and from any school."

## I.

## RULES OF CONSTRUCTION

This case requires the construction of a constitution, where the technical rules of statutory construction do not apply.   *McCulloch* v. *Maryland* (1819), 17 US (4 Wheat) 316, 407 (4 L Ed 579).

The primary rule is the rule of "common understanding" described by Justice COOLEY:

"A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81)."   (Emphasis added. )

(See also quotations on "common understanding" in the *per curiam* opinion of the companion *Carman* case, *supra.*)

A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered.   On this point this Court said the following:

"In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished." *Kearney* v. *Board of State Auditors* (1915), 189 Mich 666, 673.

A third rule is that wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does. Chief Justice Marshall pursued this thought fully in *Marbury* v. *Madison* (1803), 5 US (1 Cranch) 137 (2 L Ed 60), which we quote in part:

"If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction,   *   *   *   ."

## II.

## THE EFFECT OF AMENDED ARTICLE 8, § 2, CONSTITUTION OF 1963 ON CHAPTER 2, ACT 100 OF 1970

In *Advisory Opinion re Constitutionality of PA 1970, No 100* (1970), 384 Mich 82, we held that the Constitution of Michigan did not prohibit the purchase with public funds of secular educational services from a nonpublic school.[1]

Article 8, § 2, as amended by Proposal C, now prohibits the use of public funds "directly or indirectly to aid or maintain" a nonpublic school. The language of this amendment, read in the light of the circumstances leading up to and surrounding its adoption,[2] and the common understanding

---

[1] The concept of the state purchasing secular educational services from nonpublic schools has been implemented in various ways. Michigan implemented it by paying public monies to eligible nonpublic schools to pay a portion of the salaries of lay teachers who taught secular subjects in the nonpublic school. PA 1970, No 100, §§ 55–66a (MCLA §§ 388.665–388.676a; Stat Ann Current Material §§ 15.1919[105]–15.1919[116a]). This is similar to the Rhode Island statute which provides salary supplements to lay teachers in nonpublic school systems in order to attain salaries competitive with those of the public school system. The Pennsylvania statute provides public reimbursements to elementary parochial schools for the actual expenditures they incurred in purchasing services for secular education without regard to the fact whether the teacher was a layman or a member of a religious order.

of the words used, prohibits the purchase, with public funds, of educational services from a non-public school.

---

2 Shared time classes were held in Houghton, as early as 1921. (Letter from Assistant Attorney General Eugene Krasicky to Donald F. Winters, Clerk of the Michigan Supreme Court, p 1 [January 26, 1971]. This letter was a response from the Attorney General's office to Mr. Winters' request of January 25, 1971, asking how long shared time programs have been conducted in the State of Michigan.) They seem to have been available in various parts of the state ever since. (Letter from Assistant Attorney General Eugene Krasicky to Donald F. Winters, Clerk of the Michigan Supreme Court, pp 1, 2 [January 26, 1971], see also, Administrative Code, 1944, pp 502, 503; Stipulation of Facts paragraphs 8, 17, 17e, 17f, 17h, 17k, 21, 27 and 28.)

Bus transportation, a form of auxiliary services, goes back over thirty years to 1939, with only two years interruption. (PA 1939, No 38. The present statute requiring a public school district to provide bus transportation for both public and private school children is MCLA § 340.590a [Stat Ann 1968 Rev § 15.3590(1)]. See the Historical Note to MCLA § 340.590 for the history of bus transportation acts in Michigan.) Drivers training was initiated in 1955. (1955 Extra Legislative Session PA 1; for the present state of the law, see MCLA § 257.811 [Stat Ann 1968 Rev § 9.2511].) The present general auxliary services act dates from 1965. (PA 1965, No 343 [MCLA § 340.622; Stat Ann 1968 Rev § 15.3622].)

Federal assistance for school children is also an old and continuing story in this state. For example, hot lunch programs have been popular in the state since 1946. (National School Lunch Act, §§ 1–13, 60 Stat 230 as amended, 42 USC 1751–1761. The National School Lunch Act was enacted on June 4, 1946. It provided Federal funds for school lunches for both public and private school children. If any state educational agency was not permitted by local law to disburse funds paid to it to nonprofit private schools in the state, the Secretary of Agriculture was authorized to disburse the pro rata share of funds for private schools in that state directly to the private schools.) Federal monies under the Federal Elementary and Secondary Education Act have been available to public and private schools since 1965. (Title I of the Elementary and Secondary Education Act of 1965 which is the largest single Federal education program and the program at issue in this case is found in 20 USC § 241a *et seq.* The other relevant titles of the Elementary and Secondary Education Act are Title II promoting library services found in 20 USC § 351 *et seq.*, Title III for adult education found in 20 USC § 1201 *et seq.*, and Title IV for the education of handicapped children found in 20 USC § 1401 *et seq.* See MCLA § 388.801 [Stat Ann 1968 Rev § 15.2091] for Michigan law investing the Superintendent of Public Instruction with the authority to take any necessary action to receive the Federal funds available to school districts under Federal grant-in-aid programs. For specific reference to the Elementary and Secondary Education Act see MCLA § 388.1031 [Stat Ann 1968 Rev § 15.1025 (1)].)

Accordingly, we hold Chapter 2, Act 100, PA 1970, unconstitutional as of December 19, 1970, the effective date of the amendment, and any credits accumulated on or after that date are invalid.

---

Probate judges have been invested with the authority to place delinquent and neglected children in fosterhomes for their care and education at state expense since 1907. (1907 Extra Legislative Session PA 6; as to the present state of the law see, MCLA § 712A.25 [Stat Ann 1968 Rev § 27.3178 (598.25)].) Real and personal property tax exemptions for nonprofit, private schools date back over three-quarters of a century beginning in 1893. (See Historical Note, MCLA § 211.7 [Stat Ann 1960 Rev § 7.7].)

Unlike these earlier forms of public aid to nonpublic schools and nonpublic school children, the steps leading up to the enactment of parochiaid and serious consideration of tuition support for parents of children attending private schools are recent developments on the Michigan scene. The events culminating in the passage of parochiaid began in 1967 when the Michigan School Finance Study proposed by the State Board of Education, funded by the legislature and conducted by Dr. J. Allen Thomas recommended additional state aid for private schools. (Dr. J. Allen Thomas, *Michigan School Finance Study* [Michigan Department of Education, 1968]. See especially Chapter 8, "Non-Public Schools in Michigan.")

In 1968, the legislature created a joint committee to study the question of aid to private schools. The committee recommended to the 1969 legislature that it enact parochiaid. (*A Report and Recommendations of the Joint Legislative Committee on Aid to Non-Public Schools*, January 16, 1969. See especially pp 25–30.) House Bill 3875, which embodied the committee's recommendation was defeated by eight votes in the House. Two unsuccessful bills were introduced during the 1969 legislative session designed to give tax relief to tuition paying parents of children attending private schools. Senate Bill 1097 provided for a tax credit for any person who paid tuition for students in elementary or secondary grades in private schools. House Bill 2697 proposed that individual taxpayers be allowed to subtract the cost of tuition, books and fees for any school or college from their adjusted gross income to determine taxable income for the Michigan income tax.

Subsequent to the House defeat of parochiaid, the Governor created a Committee on Educational Reform. The Committee recommended that the legislature enact parochiaid. (*Report of the Governor's Commission on Educational Reform,* September 30, 1969. See especially p 15.) Senate Bill 1082, which included the committee's recommendation adopted by the Governor, was passed by the Senate in the 1969 session. Foreseeing House approval, the Governor included $22 million in his estimated state budget for 1970 to fund the parochiaid scheme. During February of 1970 the House approved parochiaid. The measure was sent to a joint House-Senate conference committee.

In contrast to the prior forms of state aid, parochiaid generated heated controversy both inside and outside the legislature. It took the legislature over two years to enact it. When it became clear in February of 1970 that the legislature would pass parochiaid, a group

Payments to eligible units made or credits accumulated from September 1, 1970, to and including December 18, 1970, were and are valid and constitutional, whether already disbursed or hereafter paid out. *Advisory Opinion re Constitutionality of PA 1970, No 100* (1970), 384 Mich 82.

of citizens called Council Against Parochiaid circulated petitions containing the present language of Proposal C. They succeeded in obtaining sufficient signatures to place the proposal on the ballot for the next general election on November 3, 1970. However, the State Board of Canvassers refused to certify it on the grounds the petition was defective. But, the Michigan Court of Appeals in a mandamus action brought by members of the Council Against Parochiaid ordered Proposal C on the ballot. *Carman* v. *Secretary of State* (1970), 26 Mich App 403.

On September 14, 1970, this Court rendered two important decisions. It denied leave to appeal *Carman* and upheld the constitutional validity of parochiaid. *Advisory Opinion re Constitutionality of PA 1970, No 100* (1970), 384 Mich 82. Thus, it was clear by that date that parochiaid was law in Michigan. Indeed, funds were paid out under the parochiaid scheme following the decision by the Michigan Supreme Court to eligible private schools who accepted the aid. It was also clear that the Council against Parochiaid had its challenge ready in the form of Proposal C on the fall ballot.

The stage was set for the election on November 3, 1970, for the voters to speak their judgment when they voted on Proposal C. The news media and even the active supporters and opponents of Proposal C referred to it as the "Parochiaid Proposal." Everyone agreed the proposed amendment was designed to halt parochiaid and would have that effect if adopted.

What was unclear was the impact the amendment would have on other forms of state aid to private schools. During the campaign the voter was barraged with contradictory statements on what effect the proposal would have on these various forms of state aid. Pursuant to the advice of the Attorney General, both Governor Milliken and John W. Porter, the Acting Superintendent of Public Instruction, made public statements to the effect that adoption of the amendment would terminate auxiliary service programs for nonpublic school students, jeopardize the availability of Federal funds under Title I of the Elementary and Secondary Education Act of 1965, end tax exemptions for nonpublic schools including the property tax exemption secured to nonpublic schools by Article 9, § 4 of the Michigan Constitution, and possibly affect fire and police protection as well as sewage and sanitation services (Stipulation of Facts paragraphs 2 and 3).

Erwin B. Ellmann, a spokesman for the Council Against Parochiaid, who, as a lawyer, played a key role in drafting the amendment, took issue with the statements of Governor Milliken and Mr. Porter. In published letters to Mr. Porter and the Michigan electorate, he said Proposal C would not terminate shared time or bar nonpublic school students from receiving auxiliary services; it would only limit

## III.

## EFFECT OF AMENDED ARTICLE 8, § 2, CONSTITUTION OF 1963, ON SHARED TIME

Certified question No. 1 is as follows:

Does Proposal C preclude the provision, through shared time or dual enrollment programs, of elementary or secondary instruction or educational services to nonpublic school students at any nonpublic school or at any other location or institution where instruction is offered in whole or in part to such nonpublic school students?

*Answer:* At the public school, no; on leased premises, not necessarily; on nonpublic school premises, not necessarily.

---

shared time and auxiliary services to those offered at the public school. Nor would the proposal cut off Federal funds, jeopardize fire or police protection or sewage and sanitation services or terminate the property tax exemption according to Mr. Ellmann. (See Exhibit A and Exhibit B of Intervenors-Plaintiffs brief.)

In addition to these statements many newspapers editorialized on what impact the proposal would have on the various forms of state aid to nonpublic schools. Often these editorials presented alternative interpretations of Proposal C. (See Appendix 1 of Intervenors-Defendants brief.)

As far as the voter was concerned, the result of all the pre-election talk and action concerning Proposal C was simply this—Proposal C was an anti-parochiaid amendment—no public monies to run parochial schools—and beyond that all else was utter and complete confusion.

On November 3, 1970, the proposal was adopted by the electorate by a vote of: Yes—1,416,800; No—1,078,705. As far as parochiaid was concerned, the voters rejected it.

On the day of the election the Attorney General issued formal opinion 4715 which interpreted the language of Proposal C as terminating shared time and cancelling auxiliary services for private school students. Although an opinion of the Attorney General is not a binding interpretation of law which courts must follow, it does command the allegiance of state agencies. (*Fowler* v. *Kavanagh*, [ED Mich, 1944], 63 F Supp 167; *Detroit Edison Company* v. *Department of Revenue* [1948], 320 Mich 506; *David Walcott Kendall Memorial School* v. *City of Grand Rapids* [1968], 11 Mich App 231.) Thus, the State Board of Education announced its intention to follow the opinion of the Attorney General. This led to the Traverse City School District challenging the validity of the Attorney General's interpretation of Proposal C.

The first paragraph of Article 8, § 2 requires a non-discriminatory system of education. The second paragraph, or the Proposal C part of Article 8, § 2 contains five prohibitions against the appropriation directly or indirectly of public monies or its equivalent. The five prohibitions are:

1. No public money "to aid or maintain" a non-public school;
2. No public money "to support the attendance of any student" at a nonpublic school;
3. No public money to employ any one at a non-public school;
4. No public money to support the attendance of any student at any location where instruction is offered to a nonpublic school student.
5. No public money to support the employment of any person at any location where instruction is offered to a nonpublic school student.

This Court must construe whether shared time services[3] to nonpublic school students are prohibited

---

[3] Authority for local school districts to initiate shared time programs is derived from the following statutory language:

"Every board shall establish and carry on such grades, schools and departments as it shall deem necessary or desirable for the maintenance and improvement of the schools; determine the courses of study to be pursued and cause the pupils attending school in such district to be taught in such schools or departments as it may deem expedient:" (MCLA § 340.583 [Stat Ann 1968 Rev § 15.3583].)

As good a description as any of shared time is found in the United States Senate Education Subcommittee Report on that subject, which reads:

"As generally used in current literature in the field of education, the term 'shared time' means an arrangement for pupils enrolled in nonpublic elementary or secondary schools to attend public schools for instruction in certain subjects  *  *  *  . The shared time provision is or would be for public school instruction for parochial school pupils in subjects widely (but not universally) regarded as being mainly or entirely secular, such as laboratory science and home economics." (Staff of Senate Comm. on Labor and Public Welfare, 88th Congress, 1st Session, *Proposed Federal Promotion of "Shared Time" Education* [Comm. Print 1963] p 1.)

As this quotation indicates, shared time is an operation whereby the public school district makes available courses in its general curriculum to both public and nonpublic school students normally on the premises of the public school.

by any of the five prohibitions mentioned above. This question will be considered under three headings:

1. *Shared time—at the public school.*

Attorney General's Opinion 4715 construes Proposal C to prohibit shared time services at the public school as follows:

"Under the amendment, public funds could not be used to support the attendance of nonpublic school students at 'any location or institution where instruction is offered in whole or *in part* to nonpublic school students.' (Emphasis supplied.)"

This is a shocking result. It violates both the free exercise of religion and the equal protection provisions of the United States Constitution. (See Part VIII.)

These reasons evoke the necessity of applying the rules of construction (Part I). As a consequence, the question before this Court is whether there is an alternative constitutional construction to that adopted in the aforesaid Attorney General's Opinion, which also preserves the purpose of Proposal

---

Shared time has been an accepted fact of American life for more than forty years. (Note, *Shared Time: Indirect Aid to Parochial Schools*, 65 Mich L Rev 1224 [1967]; Watkins, *Experiment in Educational Sharing*, 60 Religious Education 43 [1965]; Staff of Senate Comm on Labor and Public Welfare, 88th Congress, 1st Session, *Proposed Federal Promotion of "Shared Time" Education* 1 [Comm Print 1963] p 2; US Dept of Health, Education & Welfare, *Dual Enrollment in Public & Non-Public Schools* 5 [1965].)

On the basis of historical analysis, therefore, it would require a strong showing that Proposal C really did intend to outlaw shared time in the public schools because that had become a long accepted practice over a number of years. (*New York Trust v. Eisner* [1921], 256 US 345, 349 [41 S Ct 506, 65 L Ed 963, 16 ALR 660]; *Walz v. Tax Commission of the City of New York* [1907], 397 US 664, 678 [90 S Ct 1409, 25 L Ed 2d 697].)

The Stipulation of Facts in this case indicate that over 15,000 Michigan nonpublic school students participate in shared time programs at public schools, about 2,500 at premises leased by public schools from nonpublic schools, and about 800 at nonpublic schools. (Stipulation of Facts paragraphs 21, 27 and 28.)

C of proscribing parochiaid and, of course, is consonant with a common understanding of the language used in Proposal C. This Court has already considered a similar problem in *Advisory Opinion re Constitutionality of PA 1970, No 100* (1970), 384 Mich 82. This Court there refused to adopt "a strict 'no benefits, primary or incidental' rule" and found "no evidence  *  *  *  that the people intended such a rule when they adopted this (Article 1, § 4) provision of the Constitution." The same reasoning is applicable to the terms "support" in the second, third, fourth and fifth prohibitions and "aid or maintain" in the first prohibition.

A comparison of the parochiaid act, which this first prohibition proscribes, and shared time which this prohibition does not proscribe, is illuminating as to the construction of the prohibition.

Parochiaid as authorized by Chapter 2 of PA 1970, No 100 provided $22,000,000 of public monies for participating nonpublic school units to pay a portion of the salaries of private lay teachers of secular nonpublic school courses in the nonpublic school for nonpublic school students. In contrast shared time provides public monies for local public school districts to use to hire public school teachers to teach public school courses in public or nonpublic schools to public or public and nonpublic school students.

Shared time differs from parochiaid in three significant respects. First, under parochiaid the public funds are paid to a private agency whereas under shared time they are paid to a public agency. Second, parochiaid permitted the private school to choose and to control a lay teacher whereas under shared time the public school district chooses and controls the teacher. Thirdly, parochiaid permitted the private school to choose the subjects to be

taught, so long as they are secular, whereas shared time means the public school system prescribes the public school subjects. These differences in control are legally significant.

Obviously, a shared time program offered on the premises of the public school is under the complete control of the public school district and is not invalidated by the first prohibition against aiding a nonpublic school since such shared time instruction provides only incidental aid, if any. The second prohibition of Proposal C precludes public monies to "support the attendance of any student  *  *  * at any such nonpublic school." Any support to a nonpublic school student from a shared time program at a public school in which he participates would be only remotely incidental to his attendance at the nonpublic school and thus not prohibited. The third prohibition, no public money to employ anyone at a nonpublic school, is not here in question.

Prohibitions four and five are based particularly on the last portion of the second sentence of the second paragraph of Article 8, § 2—no public money "to support the attendance of any student or the employment of any person at any such nonpublic school *or at any location or institution where instruction is offered in whole or in part to such nonpublic school students."* (Emphasis added.) The plain meaning of this language is that when nonpublic school students go to a public school, the public school becomes an "institution where instruction is offered  *  *  *  to such nonpublic school students" and hence ineligible for public monies. This quoted language contravenes the free exercise of religion guaranteed by the United States Constitution and is violative of the equal protection of the laws provisions of the United States Constitution. (Part VIII.)

We hold that portion of the second sentence of Article 8, § 2 hereinafter quoted unconstitutional, void and unenforceable: "or at any location or institution where instruction is offered in whole or in part to such nonpublic school students."

We hold, however, that the quoted portion is severable and capable of being removed from Article 8, § 2 without altering the purpose and effect of the balance of the sentence and section.

## 2. *Shared Time—upon leased or other premises.*

Premises occupied by lease or otherwise for public school purposes under the authority, control and operation of the public school system by public school personnel as a public school open to all eligible to attend a public school are public schools. This is true even though the lessor or grantor is a nonpublic school and even though such premises are contiguous or adjacent to a nonpublic school.

Nonpublic school students receiving shared time services under such circumstances are in the same position as such students at any other form of public school and are entitled to the same rights and benefits. Consequently, as already noted, the valid portion of Article 8, § 2 does not prohibit funds for shared time under such conditions.

## 3. *Shared Time—at the nonpublic school.*

Shared time can be provided by a public school system only under conditions appropriate for a public school. This means that the ultimate and immediate control of the subject matter, the personnel and premises must be under the public school system authorities, and the courses open to all eligible to attend a public school.

Where such conditions exist the prohibitions of the valid portion of amended Article 8, § 2 do not proscribe shared time at a nonpublic school.

As to the first prohibition—no public monies "to aid or maintain" a nonpublic school—shared time at a nonpublic school provides only incidental aid, if any, to a nonpublic school under such conditions of control as a public school, as defined in the first paragraph of this section.

As to the second prohibition—no public monies "to support the attendance of any student * * * at any such nonpublic school"—shared time at a nonpublic school under such conditions of control as a public school, as defined in the first paragraph of this section, provides only incidental support to the attendance of a nonpublic school student at a nonpublic school.

As to the third prohibition—no public monies "to support * * * the employment of any person at any such nonpublic school"—shared time supports the employment of public school teachers at the public school where they draw their check, and that the location where they perform some or all of their services for shorter or longer periods of time may be a nonpublic school under such conditions of control as a public school, as defined in the first paragraph of this section, does not alter the location of their employment. This conforms to our "control" construction of the amendment and the purposes (see Part VII) for which it was adopted.

Whether or not all the public school standards described at the beginning of this section exist, this Court finds that Proposal C does not prohibit "incidental" or casual occasions of shared time instruction upon nonpublic school premises, for example, special limited courses by experts in the employ of the public school system or public instruction at a planetarium or art collection of a nonpublic school. Nor does Proposal C prohibit the regular visitations by non-instructional public school employees pro-

vided the purpose of the visitation is otherwise proper and they are not so extensive as to constitute the nonpublic school as the regular and usual work station of the public school employees.

It should be needless to observe special circumstances not considered above may create unconstitutional religious entanglements, but shared time in and of itself does not.

## IV.

## AUXILIARY SERVICES

Certified question No. 2 is as follows:

Does Proposal C preclude the provision of auxiliary services (as defined in Section 622 of Act 629, PA 1955, being Section 1 of Act 343, PA 1965, being Section 340.622 of the Compiled Laws of 1948) to nonpublic school students at any nonpublic school or at any other location or institution where instruction is offered in whole or in part to such nonpublic school students?

*Answer:* No.

Auxiliary services are best described by the statute which introduced them into the Michigan educational system. The statute reads:

"Whenever the board of education of a school district provides any of the auxiliary services specified in this section to any of its resident children in attendance in the elementary and high school grades, it shall provide the same auxiliary services on an equal basis to school children in attendance in the elementary and high school grades at non-public schools. The board of education may use state school aid funds of the district to pay for such auxiliary services. Such auxiliary services shall include health and nursing services and examinations; street crossing guards services; national de-

fense education act testing services; speech correction services; visiting teacher services for delinquent and disturbed children; school diagnostician services for all mentally handicapped children; teacher counsellor services for physically handicapped children; teacher consultant services for mentally handicapped or emotionally disturbed children; remedial reading; and such other services as may be determined by the legislature. Such auxiliary services shall be provided in accordance with rules and regulations promulgated by the state board of education   *   *   *   ." (MCLA § 340.622 [Stat Ann 1968 Rev § 15.3622]).

The State Board of Education defined "on an equal basis" to mean:

"(c) 'Equal basis' means that the services shall be made available at the nonpublic school to nonpublic school children during the established regular public school day," (Administrative Code 1964–1965 AACS, R 340.291).

By statutory definition and practical application,[4] auxiliary services are special educational services designed to remedy physical and mental deficiencies of school children and provide for their physical

---

[4] Item 26 of the Stipulation of Facts details actual implementation of auxiliary services. It states:

"Under the provisions of the auxiliary services act,   *   *   *   nonpublic school students in attendance at state approved nonpublic schools affiliated with or operated by those of the Roman Catholic faith in the State of Michigan receive a variety of auxiliary services provided by public school districts through expenditure of public funds primarily at their nonpublic school of attendance. Specifically, 67,695 children at such nonpublic schools receive hearing tests; 79,630 children at such nonpublic schools receive vision testing; 3,364 children at such nonpublic schools receive physical examination; 28,207 children at such nonpublic schools participate or receive the services of crossing guards; 3,764 children at such nonpublic schools receive remedial reading; 8,831 children at such nonpublic schools receive speech correction; 1,713 children at such nonpublic schools receive school diagnostician services; 1,265 children at such nonpublic schools are being serviced by visiting teachers."

health and safety. Functionally, they are general health and safety measures.

Drivers training, from a functional point of view, is also a general health and safety measure.[5] The state interest in providing driving instructions to high school age youth is to enable neophyte drivers to safely handle an automobile in order to protect themselves and other citizens from injuries caused by the actions of improperly trained drivers.

The legislature treats drivers education as a general safety measure rather than an educational matter. The act which created a drivers training program was enacted as an amendment to the Michigan Vehicle Code. The specific act amended was entitled "An act  *  *  *  to provide for the examination, licensing and control of operators and chauffeurs."

The prohibitions of Proposal C have no impact upon auxiliary services. Since auxiliary services are general health and welfare measures, they have only an incidental relation to the instruction of private school children. They are related to educational instruction only in that by design and purpose they seek to provide for the physical health and safety of school children, or they treat physical and mental deficiencies of school children so that such children can learn like their normal peers. Consequently, the prohibitions of Proposal C which are keyed into prohibiting the passage of public funds into private school hands for purposes of

---

[5] According to statute drivers training:

"  *  *  *  shall be conducted by the local public school district, and enrollment in driver education courses shall be open to children enrolled in the high school grades of public, parochial and private schools as well as resident out-of-school youth. Reimbursement to local school districts shall be made on the basis of an application made by the local school district superintendent to the state department of education." (MCLA § 257.811 [Stat Ann 1968 Rev § 9.2511].)

running the private school operation are not applicable to auxiliary services which only incidentally involve the operation of educating private school children.

In addition auxiliary services are similar to shared time instruction in that private schools exercise no control over them. They are performed by public employees under the exclusive direction of public authorities and are given to private school children by statutory direction, not by an administrative order from a private school.

However, we must voice one caveat and that is the possibility of excessive entanglement between church and state when auxiliary services are offered at the private school. Since auxiliary services are general health and safety measures rather than instructional measures, the possibility of excessive involvement of the state in religious affairs is, of course, at most, minimal.

Of course, what this Court holds regarding auxiliary services is limited to those services enumerated in the auxiliary services act. The clause in the act which states that auxiliary services shall include "such other services as may be determined by the legislature" does not give the legislature a blank check to make any service a health and safety measure outside the reach of Proposal C simply by calling it an auxiliary service.

We do not read the prohibition against public expenditures to support the employment of persons at nonpublic schools to include policemen, firemen, nurses, counsellors and other persons engaged in governmental, health and general welfare activities. Such an interpretation would place nonpublic schools outside of the sovereign jurisdiction of the State of Michigan.

Since the employment stricture is a part of the educational article of the constitution, we construe it to mean employment for educational purposes only.

## V.

## FEDERAL FUNDS

The third certified question is as follows :

Does Proposal C preclude use of federal moneys, made available to the State of Michigan through Title I of the Elementary and Secondary Education Act of 1965, being 20 USC, Section 241a *et seq.*, for the purpose of providing elementary or secondary instruction or educational services to nonpublic school students at any nonpublic school or at any other location or institution where instruction is offered in whole or in part to such nonpublic school students?

*Answer:* No.

Federal grants are made available to local school districts under Title I of the Federal Elementary and Secondary Education Act of 1965 (hereinafter cited as ESEA) to fund programs of special educational benefits, in the form of services or equipment, which are designed to aid educationally deprived children.[6]   The grants to a public school district in conformity to a plan submitted by the school district to obtain Federal funds are subject to the requirement that:

" * * *   to the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency has made provision for including special

[6] Elementary and Secondary Education Act, Title I, 79 Stat 27 (1965), as amended, 20 USC §§ 241a–244.

educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate;" ESEA, Sec 205(a)(2), 79 Stat 30 (1965), 20 USC 241e(a)(2) (Supp 1965).

The question is, does the language of Proposal C which prohibits "public monies" to "aid" a private school, "support the attendance" of a student at a nonpublic school or support the "employment" of any person at a nonpublic school encompass the situation where public school districts make available special educational services to both public and private school students under the required conditions of a Federal grant. We hold it does not. The adoption of Proposal C does not disallow a public school district from participation in any Federal program under Title I of ESEA for aiding elementary and secondary school children.

Two reasons lead to this conclusion. First, the nature of the special educational services are similar to auxiliary services. The character of the educational programs made available under Title I was described as follows:

"Although available statistics are far from complete, it appears that the bulk of Title I projects involve some type of non-instructional service, such as remedial reading or speech therapy. The similarity of the projects actually implemented    *    *    * seems to indicate a belief on the part of educators that the solution to the problems of educational deprivation lies in 'compensatory' educational services, which services offer the student special instruction in a skill or subject, thereby enabling him to proceed at the same rate as his peers." (Comment, *The Elementary and Secondary Education Act— The Implications of the Trust Fund Theory for*

*Church-State Questions Raised by Title I*, 65 Mich
L Rev 1184, 1187. [1967]) (Footnotes not shown.)

As this appraisal indicates, these educational serv-
ices are general health and safety measures similar
in nature to auxiliary services which we have found
to be permissible under Proposal C.

Second, the Federal funds do not become "public
monies" when they are transmitted from the Office
of Education in the Department of Health, Educa-
tion and Welfare through the State Board of Educa-
tion to the public school district. Instead the
Federal funds are impressed with a trust and must
be used by state agencies in accordance with Federal
guidelines and for the purposes for which the funds
were granted. Other courts when confronted with
the question of the status of Federal grants in aid
of education to the states have determined that a
trust arose with the Federal funds serving as the
res and the state agency, which administers the
program, serving as trustee. *Montana State Fed-
eration of Labor* v. *School District No 1* (D Mont,
1934), 7 F Supp 82, *Ross* v. *Trustees of University
of Wyoming* (1924), 31 Wyo 464 (228 P 642).

The "public monies" phrase of Proposal C, used
in the five prohibitions of the proposal, has reference
only to state resources and does not include Federal
funds. Since the Federal grants under Title I do
not become public monies of the state when they
come under the administrative control of public
school boards, Proposal C has no effect on them.

## VI.

## PRIVATE FOSTERHOMES

The fourth certified question asks:

Does Proposal C preclude direct or indirect
assistance to private institutions providing educa-

tional services to children who are placed there pursuant to court order?

*Answer:* No.

Under the probate code a probate judge is clothed with the authority to place a minor, that is any child who has not attained his seventeenth birthday, in a private fosterhome. The relevant statutory authority states:

"[The probate court] may enter an order of disposition which shall be appropriate for the welfare of said child and society  *  *  *  as follows:

(d) Place the child in or commit the child to a private institution or agency incorporated under the laws of this state and approved or licensed by the state department of social welfare for the care of children of similar age, sex and characteristics;" (MCLA 712A.18 [Stat Ann 1970 Cum Supp § 27-.3178 (598.18)].)

The private fosterhome receives county funds to pay all expenses incurred in caring for a minor placed in the home by court order.[7] Some private fosterhomes provide educational facilities and instruction for the minors who reside in the home. Payments may be made from two funds, either out of the county's general fund or out of the county's child care fund established under the social services act. These arrangements raise the question whether public funds are paid to "aid or maintain" a private school in violation of Proposal C's first prohibition.

The key language of Proposal C is "any private, denominational or other nonpublic pre-elementary, elementary or secondary school." Is a private fosterhome which serves primarily as a home but also as a school for court appointed juveniles a "nonpublic school" for purposes of the amendment?

_____

[7] MCLA § 712A.25 (Stat Ann 1969 Rev § 27.3178 [598.25]).

Both in function and operation, a private foster-home which, in addition to providing food, shelter and personal care to its residents, offers incidental educational services is a special kind of private institution. The minors placed in its care are committed to the fosterhome by order of the probate court.[8]

The minors who are committed are lawbreakers, victims of intemperate habits or products of an unsuitable home environment.[9] At the time of their commitment to a private fosterhome, they are either in the custody of the probate court or the Department of Social Welfare.[10] The fosterhome must file semi-annual progress reports to the probate court.[11] The Department of Social Welfare is responsible for developing and enforcing adequate standards of child care including living quarters, food, clothing, medical care, sanitation and recreation.[12] And the private fosterhome must be licensed by the Department of Social Welfare.[13]

Fosterhomes are special institutions for special children and are in no way a private substitute for a public school. A private fosterhome is in many ways the private counterpart to the state institutions under the purview of the Department of Social Welfare charged with caring for dependent, neglected and delinquent children, such as the Boys Training School and the Girls Training School which receive court appointed juveniles.[14] These state institutions are distinguished from "public

---

[8] MCLA § 712A.18 (Stat Ann 1970 Cum Supp § 27.3178 [598.18]).
[9] MCLA § 712A.2 (Stat Ann 1970 Cum Supp § 27.3178 [598.2]).
[10] MCLA § 712A.20 (Stat Ann 1962 Rev § 27.3178 [598.20]).
[11] MCLA § 712A.24 (Stat Ann 1962 Rev § 27.3178 [598.24]).
[12] MCLA § 722.102 (Stat Ann 1970 Cum Supp § 25.358[2]). See also Administrative Code 1954, R 400.141–400.178; 1962 AACS R 400.191–400.195.
[13] MCLA § 722.103 (Stat Ann 1970 Cum Supp § 25.358[3]).
[14] PA 1907, No 325, § 7; LA 1907, No 684, § 14; MCLA § 400.207 (Stat Ann 1957 Rev § 25.387).

schools" by Michigan statutes.[15]  Similarly, private
fosterhomes which serve the same function as these
state institutions, could be distinguished from "non-
public schools."  Moreover, private fosterhomes are
not "nonpublic schools" within the ordinary under-
standing of that term.

The highest court of the State of New York was
called upon to decide whether a contract between a
private orphanage and a city board of education
pursuant to a statute allowing cities to contribute
municipal funds, but not common school funds, to
private orphanages whereby the salaries of four
teachers at the orphanage were paid with city funds
violated the New York constitutional prohibition
against the use of public credit in aid of sectarian
schools.  In *Sargent* v. *Rochester Board of Educa-
tion* (1904), 177 NY 317 (69 NE 722), the New York
Court of Appeals held that the orphanage was not
a school or institution of learning within the mean-
ing of the state constitutional prohibition against
aid to sectarian schools.

Like our sister State of New York, we hold that a
private fosterhome which provides incidental educa-
tional services falls outside the scope of "any pri-
vate, denominational or other nonpublic pre-elemen-
tary, elementary or secondary school"[16] for purposes

---

[15] MCLA § 340.251 (Stat Ann 1968 Rev § 15.3251).  MCLA
§ 804.106 (Stat Ann 1970 Cum Supp § 28.2026).

[16] The United States Tax Court has utilized this same concept of a
"special school" to decide when the cost of attending a school for
mentally or physically handicapped persons is deductible as a medical
expense for purposes of the Federal income tax.

In the *Griesdorf* case, decided last year, a girl of average intel-
ligence suffered from an emotional disturbance which caused her to
retreat from reality to the point where she could not function normally
in an ordinary school.  A psychiatrist recommended that she attend
a private school organized to give such maladjusted children psycholog-
ical and psychiatric help in the process of educating them.  The Tax
Court ruled that this was a "special school" operating primarily to
remedy mental handicaps with only incidental educational benefits.
Thus, the entire tuition fee was deductible as a medical expense.
(54 TC No 167, paragraph 54.167 P-H TC 1970.)

of the prohibitions against public aid or maintenance, support of attendance and employment of persons at such schools.

## VII.

## TAX EXEMPTIONS

Certified question No. 5 states:

Does Proposal C deny to intervenors and their respective represented class or classes, any tax exemption, including but not limited to any exemption or exemptions from property, income, sales, use, franchise, intangibles, inheritance, "in lieu of," or any other tax or taxes, allowed them, pursuant to the Constitution and laws of the State of Michigan, prior to the adoption of Proposal C?

*Answer:* As to parents, yes. As to schools, no.

Property tax exemptions for private schools have been an accepted part of Michigan law for over three quarters of a century. What is new on the Michigan scene is serious consideration of tax relief for parents who support two school systems by paying taxes for the public school system and tuition for the private school. In fact, the Michigan legislature entertained two proposals during the 1969 legislative session which would have provided tuition paying parents tax relief.

Reading the no "credit, tax benefit, exemption or deductions" language which prefaces the second and third prohibitions in context indicates it was designed to outlaw personal tax exemptions for parents of private school children but not tax exemptions for private schools. This is the interpretation of Professor Paul G. Kauper of the University of Michigan Law School and nationally recognized authority and author on church-state affairs and

constitutional law. Professor Kauper, in a memorandum on Proposal C addressed to his colleagues on the University of Michigan Law School Faculty, writes:

"In singling out prohibited types of public benefits that may be used directly or indirectly to support the attendance of children or the employment. of persons at nonpublic schools, it uses the terms 'payment credit, tax benefit, exemption or deduction, tuition vouchers, subsidy, grant or loan of public monies or property * * * .' The 'tuition voucher' reference is clear. Under the amendment any system whereby parents are given vouchers payable out of public funds to subsidize education of their children at a school of their choice would be unconstitutional, at least to the extent that such voucher could be used to purchase education at nonpublic schools. I think it is fairly clear too that the phrase 'credit, tax benefit, exemptions or deductions,' has reference to various devices whereby special tax benefits are accorded parents who send their children to private schools * * * .

"I do not believe, however, that the effect of the proposed amendment will be to destroy the property tax exemption for property used for private school purposes, as some are contending. As indicated above, what seems to me to be the natural interpretation of the prohibition on tax exemption in the proposed amendment is that it refers to tax exemptions for parents of children attending private schools." (Kauper, *Proposal to Amend Michigan Constitution to Prohibit State Financial Assistance to Private Schools,* October 8, 1970, pp 11, 12.)

We agree with this argument taken from the Attorney General's brief at p 50:

"Had the people intended to withdraw from nonpublic schools any tax exemptions, benefits or credits they would have placed appropriate language to

accomplish such purpose in the first sentence of Proposal C. Instead, such language was placed in the second sentence only, as it relates to the support of attendance of nonpublic school pupils and the support of the employment of any person. The failure to make appropriate provision for denial of such tax exemptions is significant and compels the conclusion that Proposal C does not evidence an interest on the part of the people to prohibit any tax exemptions to nonpublic schools."

Since tax exemptions are not appropriations or payments of public monies, nor the utilization of public credit, a tax exemption granted to a nonpublic school is not unconstitutional, even though it may directly or indirectly "aid or maintain" the nonpublic school.[17]

## VIII.

## CONSTITUTIONAL QUESTIONS

The sixth certified question is:

Does Proposal C deny to intervenors and their respective represented class or classes due process of law or equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States?

*Answer:* By this Court's interpretation, no, except for the last clause of Proposal C's second sentence. By the Attorney General's interpretation, yes.

The seventh question certified to us reads:

Does Proposal C deny to intervenors and their respective represented class or classes the right to

---

[17] The gasoline tax exemption given to private schools for gasoline used in transporting students to and from school by bus (MCLA § 207.112a [Stat Ann 1970 Cum Supp § 7.302(1)]) comes within the last sentence of the amendment which allows the legislature to provide for the transportation of students to and from school.

free exercise of religion and other enumerated rights
guaranteed by the First Amendment to the Con-
stitution of the United States as made applicable to
the State of Michigan through the Fourteenth
Amendment to the Constitution of the United
States?

*Answer:* By this Court's interpretation, no, ex-
cept for the last clause of Proposal C's second sen-
tence. By the Attorney General's interpretation,
yes.

As this Court construes Proposal C, no constitu-
tional questions arise except for the last clause of
the amendment's second sentence which we found
to be unconstitutional in Part III. However, if we
adopted the interpretation of the Attorney General
(the interpretation we refer to here and hereinafter
appears in Attorney General Opinion No 4715),
serious constitutional problems would arise. The
Attorney General reads Proposal C as terminating
shared time instruction and auxiliary services for
private school children. This literal perspective on
Proposal C's mandate of no public funds for non-
public schools would place the state in a position
where it discriminates against the class of nonpublic
school children in violation of the equal protection
provisions of the Fourteenth Amendment of the
United States Constitution. In the case of parochial
or other church-related school children (and some
270,000 of the 274,000 nonpublic school students in
Michigan attend church-related schools),[18] proposal
C would violate the free exercise of religion clause
of the First Amendment to the United States Con-
stitution.[19]

---

[18] Stipulation of Facts paragraphs 19 and 20.

[19] Generally in the past, the questions regarding state aid to church-
related schools have arisen when the state has extended its aid pro-
grams to public schools or public school children to include church-
related schools or their pupils. This aid is challenged on the grounds
it violates the establishment clause of the First Amendment to the

## FEDERAL CONSTITUTIONAL QUESTION: EQUAL PROTECTION—FREE EXERCISE

*Nonpublic School Students at Public Schools*

Proposal C involves the fundamental right, protected by the Fourteenth Amendment, of a parent to send his child to the school of his choice if it meets the state quality and curriculum standards. *Pierce* v. *Society of Sisters* (1925), 268 US 510 (45 S Ct 571, 69 L Ed 1070). Proposal C's restriction of this right under the Attorney General's Opinion by prohibiting nonpublic school children from receiving shared time and auxiliary services at a public school can be justified only by a compelling state interest and by means necessary to achieve the objective. *Harper* v. *Virginia Board of Elections* (1966), 383 US 663 (86 S Ct 1079, 16 L Ed 2d 196); *Kramer* v. *Union Free School District* (1969), 395 US 621 (89 S Ct 1886, 23 L Ed 2d 583); and *Shapiro* v. *Thompson* (1969), 394 US 618 (89 S Ct 1322, 22 L Ed 2d 600) (hereinafter cited as *Shapiro*). The constitutional doctrine governing indirect burdens has been well summarized by Mr. Justice Brennan in his recent opinion sustaining the power of Congress to set residency requirements in presidential elections:

"Of course, governmental action that has the incidental effect of burdening the exercise of a constitutional right is not *ipso facto* unconstitutional. But in such a case, governmental action may with-

United States Constitution made applicable to the states through the Fourteenth Amendment to the United States Constitution. Hence, the issue has generally been whether the form of state aid provided to church-related schools or their pupils was *permissible.*

In this case Proposal C restricts state aid to church-related and other nonpublic schools. Thus, the question here is whether Proposal C violates the free exercise of religion guarantee of the First Amendment and the equal protection clause of the Fourteenth Amendment. In other words the question is whether in certain situations state aid to nonpublic schools or their pupils is *mandatory.*

stand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." *Oregon* v. *Mitchell* (1970), 400 US 112 (91 S Ct 260, 321; 27 L Ed 2d 272, 346).

Proposal C serves two state interests: precluding public expenditures for private schools and preventing state sponsorship of religion or excessive entanglement between church and state.

*Shapiro* recognized "that a state has a valid interest in preserving the fiscal integrity of its programs." However the Court said "It [the state] could not, for example reduce its expenditures for education by barring indigent children from its schools." *Shapiro, supra,* 633. Neither can Proposal C bar nonpublic school students from shared time or auxiliary services at a public school, as it is unnecessary to achieve the purpose of prohibiting public monies to nonpublic schools.

The inappropriateness of denying nonpublic school students access to shared time and auxiliary services at public schools on the basis of a state interest in preventing state sponsorship of religion or excessive entanglement between church and state is self-evident. Even a released time program which permits public school students to leave school during the school day to attend religious centers for religious instruction does not violate the "free exercise" and "establishment" clauses of the United States Constitution. *Zorach* v. *Clauson* (1952), 343 US 306 (72 S Ct 679, 96 L Ed 954).

The Attorney General's interpretation of Proposal C severely curtails the constitutional right of school selection while the state interests advanced by Proposal C do not require this intrusion upon the exercise of a fundamental constitutional right. Consequently, excluding private school children

from receiving shared time instruction or auxiliary services at the public school is a denial of equal protection. This does not mean that a public school district must offer shared time instruction or auxiliary services; it means that if it does offer them to public school children at the public school, nonpublic school students also have a right to receive them at the public school.

When a private school student is denied participation in publicly funded shared time courses or auxiliary services offered at the public school because of his status as a nonpublic school student and he attends a private school out of religious conviction, he also has a burden imposed upon his right to freely exercise his religion. The constitutionally protected right of the free exercise of religion is violated when a legal classification has a coercive effect upon the practice of religion without being justified by a compelling state interest. *Engel* v. *Vitale* (1962), 370 US 421 (82 S Ct 1261, 8 L Ed 2d 601, 86 ALR2d 1285); *Sherbert* v. *Verner* (1963), 374 US 398 (83 S Ct 1790, 10 L Ed 2d 965) (hereinafter cited as *Sherbert*). As pointed out above, there are no compelling state interests advanced by Proposal C which justify the burden placed on the choice of attending a private school out of a religious conviction.

In passing, it may be noted that the Attorney General in his brief argued that *Sherbert* is inapplicable. He pointed out "Proposal C does not deal with religious schools as such but rather with all private schools whether sectarian or non sectarian."[20] However, the Supreme Court of the United States in matters of racial discrimination looks to the "impact" of the classification. *Hunter* v. *Erickson* (1969), 393 US 385 (89 S Ct 557, 21 L Ed 2d

---

[20] Attorney General's Brief, p 83.

616). This same principle should apply to the First Amendment's protection against religious discrimination and here with 98 percent of the private school students being in church-related schools the "impact" is nearly total.

*Nonpublic School Students at Nonpublic Schools* ·

Nonpublic school students are not unconstitionally discriminated against if shared time instruction is available at public schools but not at nonpublic schools so long as they have access to shared time instruction at the public school.

Auxiliary services and drivers training, however, are general health and safety measures which must be given on a nondiscriminatory basis to all children. *State ex rel. Hughes* v. *Board of Education* (1970), —— W Va —— (174 SE2d 711), *cert. pending* in the United States Supreme Court as No 517, October 1970 term,[21] and see *Everson* v. *Board of Education* (1947), 330 US 1 (67 S Ct 504, 91 L Ed 711).[22]

---

[21] In *State ex rel. Hughes v. Board of Education* (1970), —— W Va — (174 SE2d 711), *cert. pending* in the United States Supreme Court as No. 517, October 1970 term, the West Virginia Supreme Court held that statutory language providing that a county board of education "shall have authority to provide at public expense adequate means of transportation for all children of school age" made it mandatory on the school board to provide transportation for those attending parochial schools when transportation was provided for public schools. Not to do so, said the West Virginia Supreme Court, would deny to parochial school children and their parents the equal protection of the laws guaranteed by the Fourteenth Amendment, and would also violate the free exercise of religion clause of the First Amendment.

[22] *Everson v Board of Education* (1947), 330 US 1 (67 S Ct 504, 91 L Ed 711, 168 ALR 1392) illuminates the circumstances when the state's interest in preventing state sponsorship of religion or excessive entanglement between church and state applies; or rather does not apply. In *Everson*, the United States Supreme Court upheld a New Jersey statute that reimbursed parents of both parochial and public school children for costs of bus transportation to and from school. The statute was challenged on grounds that it violated the establishment clause of the First Amendment. The court compared bus transportation to police and fire protection, saying both were examples of general health and safety legislation. As such, they served a legitimate secular legislative purpose with only an incidental

## IX.

## CONCLUSIONS

This Court reaches the following summary conclusions:

1. Proposal C above all else prohibits state funding of purchased educational services in the nonpublic school where the hiring and control is in the hands of the nonpublic school, otherwise known as "parochiaid."   (Part II.)

2. Proposal C has no prohibitory impact upon shared time instruction wherever offered provided that the ultimate and immediate control of the subject matter, the personnel and the premises are under the public school system authorities and the courses are open to all eligible to attend the public school, or absent such public school standards, when the shared time instruction is merely "incidental" or "casual" or non-instructional in character, subject, of course, to the issue of religious entanglement.   (Question 1; Part III.)

3. Proposal C does not prohibit auxiliary services and drivers training, which are general health and safety services, wherever these services are offered except in those unlikely circumstances of religious entanglement.   (Question 2; Part IV.)

4. Proposal C does not attempt to interfere with the distribution of Federal funds.   (ESEA.)   (Question 3; Part V.)

5. Proposal C does not, in an educational proposal, intervene to prohibit the operation of a social

---

benefit to religion.   This reasoning would apply to auxiliary services and driver education which are also examples of general health and safety legislation.

In the light of the *Everson* case, it is clear that health and safety measures only incidentally benefit religion and do not constitute state support of or excessive entanglement in religion.   Hence, it is not necessary to prohibit auxiliary services on the premises of the nonpublic school to achieve this objective.

welfare institution such as a fosterhome. (Question 4; Part VI.)

6. Proposal C does not change Michigan's long-standing policy of tax exemption for religious, charitable, and educational institutions. (Question 5; Part VII.)

7. Regarding the constitutionality of Proposal C (Questions 6 and 7; Part VIII):

a. The language "or at any location or institution where instruction is offered in whole or in part to such nonpublic school students" at the end of the second sentence in Proposal C is unconstitutional, void and unenforceable and is severable and capable of being removed from Article 8, § 2 without altering the purpose and effect of the balance of the sentence and section. (Part III, § 1.)

b. The remainder of Proposal C's language by this Court's construction of Proposal C raises no questions of unconstitutionality under the Michigan or the United States Constitutions.

c. An interpretation of Proposal C that nonpublic school children are barred from shared time in the public schools and from auxiliary services and drivers training at public and nonpublic schools is unconstitutional under the United States Constitution.

The foregoing answers to certified questions one through seven will be certified to the 13th Circuit for disposition of the cause in accord with this opinion. No costs.

BLACK, T. E. BRENNAN, T. G. KAVANAGH, and SWAINSON, JJ., concurred with WILLIAMS, J.

T. M. KAVANAGH, C. J. (*dissenting in part and concurring in part*). For the reasons stated in my separate opinion in *Carman* v. *Secretary of State* (1971), 384 Mich 443, we believe this case should

be dismissed with prejudice. However, the majority opinion in *Carman, supra,* is for the present at least, the law in Michigan.

We agree that if Proposal C was properly submitted to the people and properly adopted, the opinion of Justice Williams correctly interprets our Constitution as amended and correctly applies the due process and equal protection clauses of the Federal Constitution.


T. G. Kavanagh, J., concurred with T. M. Kavanagh, C. J.


Adams, J. (*dissenting in part and concurring in part*). In *Carman* v. *Hare* (1971), 384 Mich 443, this Court decided that the people duly adopted an amendment to the Constitution, submitted as Proposal C at the general election of November 3, 1970, and that its language became a part of the Michigan Constitution on the following December 18. If this added provision does not violate the Federal Constitution (Questions 6 and 7), it is controlling and our duty in this case, in answering the stated questions, is simply to apply and, if need be, to construe its provisions.

I agree with Justice Williams that this case raises the question of the construction of Article 8, § 2, as amended. I agree with him as to the rules of construction, but would add that we recently had occasion to consider the language of the first paragraph of Article 8, § 2, in the case of *Bond* v. *Ann Arbor School District* (1970), 383 Mich 693. In that case, in a unanimous *per curiam* opinion, this Court stated (pp 699, 700):

"*The first rule* a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as under-

stood by the people who adopted it. See *People, ex rel. Twitchell,* v. *Blodgett* (1865), 13 Mich 127, 141, 167; *People* v. *Board of State Canvassers* (1949), 323 Mich 523, 528, 529; and *Michigan Farm Bureau* v. *Secretary of State* (1967), 379 Mich 387, 390, 391." (Emphasis added.)

The petitions to place Proposal C on the ballot were drafted and circulated before the legislative enactment appropriating $22,000,000 for private schools, commonly known as "parochiaid," became law. The petitions were circulated in February and March of 1970 and were filed with the Secretary of State on June 25 and July 2, 1970. Parochiaid did not become law until July 20, 1970. Prior to the adoption of parochiaid, other proposals by way of tax relief to parents of children attending private schools, or to individual taxpayers for expenses connected with attendance at schools or colleges, were considered by the legislature.

Before the adoption of Proposal C, the Constitution clearly provided for "free public elementary and secondary schools * * * without discrimination as to religion, creed, race, color or national origin." Proposal C addressed itself to state involvement in private schools in the light of the debate that had been raging in the legislature and among the public as to whether there should be any such involvement, whether in the form of parochiaid, tax credits, or whatsoever. The language of Proposal C is clearly aimed at no involvement in whatever form it might take with the one exception that the legislature could provide for the transportation of students to and from any school.

Turning to the certified questions, as to question number one, my answer is: At the public school, "No"; on nonpublic school premises, "Yes." I would leave for future determination on a case-by-case

basis whether or not so-called leased premises constitute a bona fide portion of the public school premises or are merely a device to attempt to circumvent the prohibitions of Proposal C. It seems obvious that to provide shared-time programs in private schools would constitute the use of public moneys to aid or maintain such schools in their operations and that it would tend to support the attendance of students at such nonpublic schools. Once the door is open to shared-time programs in private schools, it would be a simple matter, by the use of such programs, to achieve all of the objectives attempted by parochiaid and to defeat completely what the people attempted to achieve by adopting Proposal C.

I agree with Justice WILLIAMS that Proposal C does not prohibit shared-time instruction for private school students in the public schools. In such a situation, the so-called shared-time student is nothing more than a part-time public school student. His status is no different from that of any other student who is enrolled less than full time. In dealing with this constitutional question, I would therefore determine a student's status at a given time by the school he attends. Students who attend both public school and nonpublic school for different courses of study are, in my opinion, both public and nonpublic school students.

This is the rationale of the released time student who attends a private school for religious instruction. If he were considered to be a public school student while in attendance at the religious school, this would be constitutionally forbidden. There is nothing about attendance at a public school or a private school that justifies tagging a student as belonging exclusively to one or the other. Therefore, I can find no partial invalidity in what Justice WILLIAMS refers to as Proposal C's fourth and fifth

prohibitions. A student attending public school, even for only a portion of the day, is a public school student while attending public school classes.

If place of attendance is not used as the test of student status, all rules of constitutional construction as to the meaning of Proposal C are violated—(1) we fail to give effect to the plain meaning of the words of Proposal C as understood by the people who adopted it—the "common understanding"; (2) we fail to take account of the circumstances surrounding the adoption of Proposal C; and (3) we ignore an interpretation that does not create constitutional invalidity, going out of our way to adopt an interpretation that does.

The language of Proposal C and the prohibitions therein contained are aimed at private schools and institutions—to expand the prohibitions as applying to public schools runs counter to the plain meaning and intent of Proposal C and of the language used. In any event, Federal and state equal protection guarantees require that programs offered in the public school be made available to all students, whether from public or private schools, on an equal basis.

I agree with Justice WILLIAMS' answer to question number two—Auxiliary Services. General health and safety measures are not within the reach of the prohibitions contained in Proposal C.

I agree with Justice WILLIAMS' answer to question number three—Federal Moneys under Title I.

I am unable to agree with Justice WILLIAMS' answer to question number four—Private Foster Homes. The question which confronts us here is not whether a probate judge has authority to place a minor in a private foster home but whether public moneys paid to private foster homes may be used to provide educational facilities and instruction for

the minor who resides in the home.   The prohibitions of Proposal C are against the expenditure of public moneys "to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school," and against payment "to support the attendance of any student or the employment of any person at any such nonpublic school or at any location or institution where instruction is offered in whole or in part to such nonpublic school students."   A school is a school, whether conducted by a private foster home, by a church, or by the state.

Neglected or dependent children are wards of the state.   The state owes a special obligation to them, especially the neglected child who, through no fault of his own, lacks a proper home atmosphere.   In fulfilling its obligation, some such children are sent to state institutions.   Others are placed in private foster homes.   The responsibility to provide schooling for all children is a state responsibility, specifically enunciated in the first paragraph of Article 8, § 2, wherein the legislature is required to maintain and support a system of "free public elementary and secondary schools  *  *  *  without discrimination as to religion, creed, race, color or national origin."   I fail to see how this responsibility can be shifted to private foster homes at public expense without unduly discriminating against the neglected or dependent children who are sent to those private foster homes and are thereby relegated to private schooling wholly outside the bounds of the state's constitutional responsibility.

I agree with Justice WILLIAMS that the answer to question number five is "Yes" as to parents, and "No" as to schools.

With regard to questions number six and number seven—Constitutional Questions—as I would con-

strue Proposal C, there is no violation of due process of law or equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States, or of the right to free exercise of religion and other enumerated rights guaranteed by the First Amendment to the Constitution of the United States as made applicable to the State of Michigan through the Fourteenth Amendment to the Constitution of the United States.